# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ESTATE OF YONADAV HIRSHFELD,
     Plaintiffs,

    v.

ISLAMIC REPUBLIC OF IRAN,
     Defendant.

Civil Action No. 15-1082 (CKK)

## MEMORANDUM OPINION
(Aug. 30, 2018)

This case arises from the March 6, 2008 death of 18-year old Yonadav Hirshfeld, while he was at the Mercaz Harav Yeshiva in Jerusalem, Israel where he went to school. *See* Transcript of April 24, 2018 Bench Trial held before the Honorable Colleen Kollar-Kotelly ("Tr."), ECF No. 38, at 4-5. Plaintiffs—the estate, heirs, and immediate family members of the deceased—allege that Yonadav Hirshfeld ("Yonadav") was killed by a shooter affiliated with Hamas, a terrorist organization.[1] Proceeding under the Foreign Sovereign Immunities Act ("FSIA"), Plaintiffs allege that Defendant Islamic Republic of Iran ("Iran") provided material support and resources to Hamas and accordingly should be held liable for Yonadav's death. The Court agrees with Plaintiffs' assessment.

Defendant has not answered or otherwise participated in this litigation, and therefore, the case proceeded in a default setting, with Plaintiffs filing a [30] Motion for Default Judgment. The

---

[1] Plaintiffs include: the Estate of Yonadav Hirshfeld, through its administrator, Michael Engelberg; Yonadav's parents Elisheva and Zemach Hirshfeld; and Yonadav's twelve siblings — Shalom Hirshfeld, Nehemiya Hirshfeld, Amiel Hirshfeld, Zimrat Bracha (Hirshfeld) Zuckerman, Haya Hamital (Hirshfeld) Novick; Yedidya Hirshfeld; Hana (Hirshfeld) Shandorfy, David Yinon Hirshfeld, and Aviya (Hirshfeld) Freedman; Elyashiv Schmuel Hirshfeld (who was a minor when the lawsuit was brought); and E.H. and S.H. (minors represented by their parents). Am. Compl., ECF No. 7.

Court held a bench trial on April 24, 2018. Upon consideration of the pleadings, the relevant legal authorities, the demeanor of the witnesses, and the record as a whole, the Court has determined that Plaintiffs have established their claims by evidence satisfactory to the Court and accordingly will GRANT default judgment against Defendant. The Court will also consider the issue of appropriate damages for each Plaintiff.

## I. BACKGROUND

Plaintiffs filed this lawsuit on July 10, 2015. Compl., ECF No. 1. An Amended Complaint was filed on December 8, 2015. Am. Compl., ECF No. 7. Plaintiffs then grappled for years to fulfill the requirements for service on Defendant Iran, due to the lack of diplomatic relations between the United States and Iran. On October 10, 2017, this Court issued a Memorandum Opinion and Order deeming service effective pursuant to 28 U.S.C. Section 1608(a)(4). Memo. Op. and Order, ECF No. 27. Approximately one month later, the Plaintiffs filed a Motion for a Default Judgment; a supporting Memorandum and Proposed Findings of Fact and Conclusions of Law; and sworn declarations by the Plaintiffs, two witnesses to the incident, and two experts. Mot. for Default Judg., ECF No. 30; Memo. in support of Mot. for Default Judg., ECF No. 30-2. Plaintiffs urged this Court to bypass holding a hearing and to find the sworn declarations and proposed findings of fact and conclusions of law sufficient to satisfy the requirement of the FSIA, 28 U.S.C. Section 1608(e), that a claimant must "establish[ ] [his] claim or right [to] relief by evidence that is satisfactory to the court." *Reed v Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012). In its discretion, however, this Court decided to hold a bench trial with live witnesses instead of relying solely on sworn declarations.

The Court held a bench trial on April 24, 2018, at which time Plaintiffs offered documentary, photographic and video evidence, and they presented: (1) live testimony by

Yonadav's parents, one sibling, and two expert witnesses; (2) deposition testimony of two eye witnesses and one additional expert witness; and (3) deposition testimony and/or affidavits by Yonadav's other eleven siblings. This hearing addressed both the Plaintiffs' claims on liability and the resulting damages. After the trial, Plaintiffs submitted Post-Hearing Proposed Findings of Fact and Conclusions of Law, ECF No. 39.

## II. LEGAL STANDARD

The entry of default judgment is governed by Fed. R. Civ. P. 55. "The determination of whether a default judgment is appropriate is committed to the discretion of the trial court." *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 150 (D.D.C. 2011) (citing *Jackson v. Beech,* 636 F.2d 831, 836 (D.C. Cir. 1980)). Before granting default judgment, the Court must satisfy itself of its jurisdiction, and "[t]he party seeking default judgment has the burden of establishing both subject matter jurisdiction over the claims and personal jurisdiction over the defendants." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016).

Under the FSIA specifically, this Court cannot enter default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see Fraenkel v Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018) (To obtain a default judgment in a Section 1605A action, plaintiffs have to establish a right to relief by providing "evidence satisfactory to the court."); *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court . . . has an obligation to satisfy itself that plaintiffs have established a right to relief."). "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014), and "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true," *Thuneibat*, 167 F. Supp. 3d at 33. Section

1608(e) "does not require the court to demand more or different evidence than it would normally receive; . . . indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens v Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (citations omitted), *petition for cert. filed*, 864 F.3d 751 (Mar. 6, 2018) (No. 17-1406).

## III. FINDINGS OF FACT[2]

The following Findings of Fact recount a tragic event. They detail the murder of Yonadav Hirshfeld, a young man attending a school in Jerusalem, Israel, where a shooter purposefully targeted Jewish students. As discussed further below, in addition to expert testimony received by the Court, three members of Yonadav's family testified at the Court's bench trial regarding the circumstances surrounding the death of their loved one. The Court appreciates that providing such testimony was extremely difficult for each witness, as it required them to revisit publicly what was likely the most tragic event in their lives. The Court also acknowledges that the current legal proceedings cannot make these family members whole again or even ease their pain.

The Court's Findings of Fact are based on testimony presented at the bench trial held in this matter on April 24, 2018, as well as evidence submitted prior to and during that trial.[3] The

---

[2] The Court's findings of fact pertain to liability and damages. The Court considered both aspects of this case during the April 24, 2018 bench trial and did not refer the damage determination to a Special Master.

[3] In addition to the live testimony at trial, this Court considered the following evidence that was submitted prior to the trial: Declarations by Amiel Hirshfeld, Aviya Freedman, Hana (Hirshfeld) Shandorfy, Elyashiv Schmuel Hirshfeld, and Elisheva Hirshfeld (on behalf of minors S.H. and E.H.). *See* Mot. for Default Judg., ECF No. 30, Exs. 10, 12, 16, 17, 18 and 19. The Court also considered the following evidence that was submitted at trial: the *de bene esse* deposition transcripts of witnesses Shimon Balsam (read into the record), Zvi Yehuda Kofman (read into the record), Nehemiya Hirshfeld, Zimrat Bracha (Hirshfeld) Zuckerman, Haya Hamital (Hirshfeld) Novick, Yedidya Hirshfeld, David Yinon Hirshfeld, and expert witness Mark Berenblut; and exhibits 1, 2, 3, 4, 5-6 (expert CVs only), and 8. *See* Exhibit List, ECF No. 37. Citations to testimony from the bench trial are in the following format: "name, Tr. page number," *i.e.,* witness name and transcript page number.

Court's findings fall into three overarching categories: (1) Hamas and Iran's material support for it; (2) how that support resulted in the death of Yonadav Hirshfeld in this case; (3) facts relevant to the determination of the damages which are warranted with regard to Yonadav's parents, siblings, and his Estate.

## A.     Iran's Material Support for Hamas

The facts contained in this section are largely derived from the testimony of two experts with extensive experience studying, writing, and testifying about Iran:  Dr. Patrick Clawson, the Director of Research at The Washington Institute for Near East Policy, and Dr. Matthew Levitt, a Senior Fellow and Director of the Stein Program on Counterterrorism and Intelligence at The Washington Institute for Near East Policy.  Clawson Tr. 71; Levitt Tr. 81.[4]  As a preliminary matter, Hamas may be characterized as a Palestinian political organization that was founded in 1987 with a purpose of carrying out militant attacks against Israel, and which has effectively controlled the Gaza Strip since 2007.[5]  Clawson Tr. 74-75; Levitt Tr. 89-90 ("Hamas is a U.S., European, and other-designated terrorist organization, . . . [b]ut it is a movement and it has other components too [political and social welfare] . . . [and] these components are used to leverage its ability to wage, in its terms, jihad, or a holy war[.]"); Am. Compl. ¶¶ 13-14 ("Hamas is listed by the United States Department of State as a Foreign Terrorist Organization ("FTO")" and has been listed as [such] since 1997."); Am. Comp. ¶¶ 15-16 ("Hamas is listed as a Specially Designated

---

[4] Having considered the requirements set forth in Federal Rule of Evidence 702 for the admission of expert testimony, the Court qualified Dr. Patrick Clawson as an expert on Iran's economy and support of terrorist organizations.  Clawson Tr. 73; Ex. 5 (Dr. Clawson Curriculum Vitae) and qualified Dr. Matthew Levitt as an expert on Hamas and its financing and support and state sponsorship by Iran.  Levitt Tr. 87; Ex. 6 (Dr. Levitt Curriculum Vitae).

[5] Hamas is short for Harakat al-Muqawamah al-Islamiyya or "the Islamic Resistance Movement."  *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 77 (D.D.C. 2017).

Global Terrorist ("SDGT") pursuant to Executive Order 13224" and has been listed like that "since October 31, 2001.")  The relationship between Hamas and Iran became close after 1993 — after the Palestine Liberation Organization reached an agreement with Israel, the Iranians turned to Hamas, a more militant organization, to sponsor terrorist attacks against Israel, and this is when Iran started providing Hamas with material support.  Clawson Tr. 74-75.

The Court finds that Iran provided substantial material support to Hamas leading up to and immediately before and including the date of the Mercaz Harav Yeshiva incident, which occurred on March 6, 2008.  Clawson, Tr. 79-80.  During this period, Iran lent support to Hamas by providing weaponry, munitions, training, and millions of dollars in financial support.  Clawson Tr. 75-79.  The fact that Iran provided substantial assistance to Hamas was acknowledged by the United States Department of State in its Country Reports on Terrorism covering the years 2007 and 2008.  Clawson Tr. 76.  Furthermore, Hamas operatives went to Iran for military training, and this connection between Hamas and Iran was openly acknowledged insofar as the head of Hamas, Khaled Mashal, went to Tehran and met with senior Iranian officials, including the Ayatollah Khamenei.  Clawson Tr. 76.  In June 2007 and again in February 2008, the Iranian foreign minister met with Khaled Mashal.  Clawson Tr. 76.

 The Court finds that Iran provided most of Hamas's financing and resourcing during the period leading up the Mercaz Harav Yeshiva shooting, and this includes material support in the form of funding, weaponry, training, in-kind services, and ideological support.  Levitt Tr. 89, 91, 112-113; Clawson Tr. 74 ("Iran has always provided support for Hamas . . . [a]nd during the times when the relationship was close, like that in 2007, 2008, Iran provided Hamas with very substantial material support.")  Millions of dollars were provided by Iran to Hamas, with an uptick in spending in 2003, 2004, and 2007.  Levitt Tr. 110-111; Clawson Tr. 77 ("A very respected Arab newspaper

published in London called Al-Sharq Al-Awsat . . . said, in May of 2008, that Iran pledged $250 million to Hamas.") Financial support was not only being provided to the active terrorist wing of Hamas known as Qassam, but also to the rest of Hamas. Levitt Tr. 89-91 ("[T]he evidence of Iranian funding for Hamas is overwhelming, including statements from Iranian officials themselves, statements from Hamas officials themselves" as well as "U.S. officials, again, just days before this attack talking about how the majority of the financing Hamas gets it gets from Iran.")

In the days leading up to the March 6, 2008 shooting at the Mercaz Harav Yeshiva, Hamas had threatened attacks. Levitt Tr. 92-94 ("In the period leading up to the attack in question, we created the, kind of, environment of tension leading up to what happened in Jerusalem in March 2008."). In an attack like the one at the Mercaz Harav Yeshiva, a shooter would likely need training to learn to quickly load and reload a weapon, and how to move around a location and fire at the same time to ensure operational success. Levitt Tr. 107. The type of training provided by Iran encompassed everything from small arms and special capabilities to sniper training, making explosives, handling/reassembling weapons, and kidnapping. Levitt Tr. 105-106. A few days after the March 6, 2008 shooting, Iranian and Hamas officials made statements whereby they noted that 300 Hamas operatives had been sent to Iran for training, and 150 of them were still there. Levitt Tr. 90-91.

In the immediate aftermath of the attack, the assailant was identified by Israeli authorities as Alaa Abu Dhein. Levitt Tr. 94-95. At that time, there were conflicting claims of responsibility for the attack, and Hamas did not explicitly say whether it took credit for the attack or not, although an official Hamas announcement praised the attack. Levitt Tr. 95-97. There are political and operational/security reasons for a delayed claim of responsibility regarding an attack, particularly

in sensitive cases such as this one involving an attack on civilian students in Jerusalem, and these reasons include concerns about preparing for reprisal against Hamas in general and Hamas infrastructure in the Gaza Strip, as well as providing time for persons who aided in the attack to escape. Levitt Tr. 99-101. Ultimately, in December of 2010, on the 23rd anniversary of Hamas's founding, the Hamas prime minister and a head of the Qassam Brigade [military terrorist wing of Hamas] made statements in an official Hamas publication called *Path to Glory*, whereby Hamas took responsibility for the March 6, 2008 Mercaz Harav Yeshiva attack, and this claim of responsibility has never been rescinded. Levitt Tr. 100-104.

As primarily relevant to this case, the support described above by Iran was crucial to Hamas. The Court is satisfied by Plaintiffs' showing that Iran's support and sponsorship of Hamas was a well-known matter of Iranian policy, and further, that Iran not only provided most of Hamas's funding over the course of many years, including at the time of the attack at issue, but Iran also assisted Hamas in obtaining weaponry and providing training and other resources. In short, the Court finds that Iran provided material support to Hamas at the time of the incident underlying this case – March 6, 2008.

## B.     Hamas, Materially Supported by Iran, Killed Yonadav Hirshfeld

Next, the Court finds that Hamas, supported by Iran, is responsible for the death of Yonadav Hirshfeld. On March 6, 2008, Yonadav visited his great-grandmother at her house, and he checked in with his mother by telephone around 7:30 p.m. and told her he planned to come home that night after his evening studies at the Mercaz Harav Yeshiva because he wanted to lead some boys on a hike the following day. Elisheva Hirshfeld Tr. 15-16. Later that evening, Yonadav was standing near the entrance to Mercaz Harav talking with his fellow students, Shimon Balzam and Zvi Yehuda Kofman, when the three of them saw a man of Arab appearance carrying a large television box. *See* Transcript of April 10, 2018 Deposition of Shimon Balzam ("Balzam Depo."),

at 9-10; Transcript of March 19, 2018 Deposition of Zvi Yehuda Kofman ("Kofman Depo.") at 9-10.[6]  When the man was approximately two or three meters away from the boys, he put down the box and took out a Kalashnikov rifle and began firing in the boys' direction.  Balzam Depo. 10; Kofman Depo. 12.  The boys saw other students running, and they began running away from the man toward the building which houses the classrooms, which was between 14 and 20 meters away.  Balzam Depo. 11; Kofman Depo. 13-14.  Yonadav was running behind Mr. Kofman, and Mr. Kofman felt Yonadav's blood spraying onto his arm and vaguely remembered Yonadav shouting as Mr. Kofman ran toward the women's section of the building.  Kofman Depo. 13-14.  Mr. Kofman was not injured, but as he ran, his shirt became covered with blood that must have been Yonadav's because Mr. Balzam started running later and was farther away.  Kofman Depo. 14-15, 24-25.

Yonadav ran to the entrance where there were stairs that went down on the left side, and he made it to the bottom of the stairs before falling, and it was estimated that running to that point would have taken him approximately 15 seconds, as it is 20-25 meters from where they were standing when the shooting began. Kofman Depo. 14, 16-17.  When Mr. Balzam entered the building and started going down the stairs, he observed Yonadav lying on the landing between the two stairwells, so he concluded that Yonadav must have run ahead of him, but Mr. Balzam kept going past Yonadav because Mr. Balzam had been shot and was in shock.  Balzam Depo. 11-12.  Neither Mr. Balzam nor Mr. Kofman could say exactly when Yonadav died, but they both

---

[6] The Court admitted the deposition testimony of fact witnesses Shalom Balzam and Zvi Yehuda Kofman, two of Yonadav's schoolmates who were with him on the day of the incident, as part of the trial testimony.  Mr. Balzam's testimony was read into the record at Tr. 64, and a videotape re-enacting the events of March 6, 2008, which was narrated by Mr. Balzam, was shown. *See* Exhibit 8 (video); Tr. 65, 67.  Mr. Kofman's testimony was read into the record at Tr. 115-116.

indicated that Yonadav was alive immediately after he was shot because he ran into the building until he reached the stair landing where he fell, which is about 4 meters from where he entered the building. Balzam Depo. 15-16; Kofman Depo. 17-18. Medical help arrived approximately 20 minutes after the attack commenced, and Yonadav's lifeless body was found on the staircase at that time. Balzam Depo. 13-15, 29; Kofman Depo. 15-17.[7]

## C.  Yonadav Hirshfeld

1. Background

Yonadav was the fifth of thirteen siblings born to Elisheva Hirshfeld ("E. Hirshfeld") and her husband Zemach Hirshfeld ("Z. Hirshfeld"). E. Hirshfeld Tr. 7, 9, 10. When Yonadav was one year old, his parents, who resided in Israel, registered him as a United States citizen. E. Hirshfeld Tr. 9; *see* Ex. 2 (Certification of Birth Abroad of a Citizen of the United States). As a child, Yonadav was full of life and mischievous; he liked challenges and was "quick on his feet" during arguments, and he was also friendly and loved to read and play with balls. E. Hirshfeld Tr. 10; Z. Hirshfeld Tr. 40-41. Yonadav's father recalled that Yonadav liked school and enjoyed trips, particularly those that involved a bit of a risk. Z. Hirshfeld Tr. 41. Yonadav always did well in school but it was not until high school that he developed discipline in his studies, particularly his religious studies. E. Hirshfeld Tr. 12-13, Z. Hirshfeld Tr. 41-42. In high school, Yonadav was a talented student who scored high grades, and he liked to learn, write poems and stories, play the recorder, dance and hike. E. Hirshfeld Tr. 12-13. He was also a counselor for a community youth group. E. Hirshfeld Tr. 13-14. Upon completing high school, Yonadav began his studies in 2008 at the Mercaz Harav Yeshiva in Jerusalem, which offered religious studies. E. Hirshfeld Tr. 14-

---

[7] The Court notes that the testimony of Zvi Yehuda Kofman was consistent with the testimony of Shimon Balzam in terms of describing the events leading up to the shooting and death of Yonadav Hirshfeld on March 6, 2008.

15.  He was 18 years old and in his first year at the Mercaz Harav Yeshiva at the time the shooting incident occurred.  Tr. 4; E. Hirshfeld Tr. 15.

Elisheva Hirshfeld described Yonadav's relationships with his siblings as follows: "[e]verybody thought [Yonadav] liked them the best" and "he loved to play with them, he loved to talk to them, he loved to have fun."  E. Hirshfeld Tr. 10, 12.  Yonadav loved to play with and talk to all his siblings as well as playing ball and other games with his nieces and nephews.  E. Hirshfeld Tr. 11-12.  Yonadav was also very thoughtful about spending time with his grandparents. E. Hirshfeld Tr. 14.  In Yonadav's family "everybody felt close" and Yonadav was "very much" liked by his brothers and sisters, but because of the age spread among the siblings, some of whom were adults, they saw each other mostly on the weekends.  E. Hirshfeld Tr. 10, 12.

2. The Incident and Immediate Aftermath

At approximately 8:30 p.m. on March 6, 2008, Elisheva Hirshfeld received a call from one of Yonadav's friends, inquiring if she had been in touch with Yonadav and informing her that there was a terrorist attack at the Mercaz Harav Yeshiva.  E. Hirshfeld Tr. 15-16.  Zemach Hirshfeld was volunteering on ambulance duty that evening, when he heard that something had happened at Mercaz Harav Yeshiva, and he returned home to await further news.  Z. Hirshfeld Tr. 42. Yonadav's brother Shalom Hirshfeld ("S. Hirshfeld"), who was 14 years old, was on his way back from a visit to the Old City in Jerusalem with some friends, in a car operated by his neighbors, when one of his friends heard about the attack on the radio and conveyed that information to Shalom, who started trembling uncontrollably.  S. Hirshfeld Tr. 50.  By the time Shalom got home, everyone in the family was very nervous and people began coming to their house to await news of Yonadav.  S. Hirshfeld Tr. 52-53.

That evening, Elisheva Hirshfeld tried to contact Yonadav, who did not have a cell phone, by calling his friends at the Mercaz Harav Yeshiva. E. Hirshfeld Tr. 16-17. At some point, Elisheva Hirshfeld or her son-in-law spoke to someone at the Mercaz Harav Yeshiva office who said that they had seen Yonadav and would tell him to call home. E. Hirshfeld Tr. 16-17; Z. Hirshfeld Tr. 42-43. Hours passed with no phone call from Yonadav as the family grew increasingly more worried; finally, at around 11:45 p.m., their community rabbi came by to inform the family that Yonadav had died. E. Hirshfeld Tr. 18; Z. Hirshfeld Tr. 43.

In the early morning hours of March 7, 2008, Zemach Hirshfeld had to go to Jerusalem to identify his son's body. E Hirshfeld Tr. 19; Z. Hirshfeld Tr. 44. The atmosphere in the house later that day was "very, very heavy" and "[e]verybody was confused, [with] very mixed feelings" and "there was no room for anything else but the feelings and thoughts about what ha[d] happened." S. Hirshfeld Tr. 54, 56. Yonadav's first funeral service was combined with a service for the other 7 boys who died because of the shooting, and there was also a second, smaller, private service at Kochar Hashachar, where he was buried. E. Hirshfeld Tr. 20-21; Z. Hirshfeld Tr. 44-45. Yonadav's death certificate lists the "reason for death" as "terrorist attack." See Ex. 3 (Death Certificate).

3. Testimony of Family Members

a. Elisheva Hirshfeld, Yonadav's mother[8]

Elisheva Hirshfeld's description of the events of March 6, 2008 follows. When Elisheva Hirshfeld ("Elisheva") found out that there was an attack in progress at the Mercaz Harav Yeshiva and she could not get in contact with Yonadav, she began to have a feeling of dread and imagined

---

[8] Elisheva Hirshfeld is a United States citizen resident in Israel. E. Hirshfeld Tr. 7-8.

Yonadav hiding in a closet and being afraid to come out.[9]  E. Hirshfeld Tr. 16-17.  Elisheva suggested to her husband that they drive to Jerusalem and go look for Yonadav, but her husband told her that the roads were closed anyhow.  E. Hirshfeld Tr. 17.  Her first thought upon learning that Yonadav was dead was disbelief because "[h]e was such a special boy, [this] can't happen to him," and later she felt "dried out and empty."  E. Hirshfeld Tr. 18.  Discussing the funeral, Elisheva noted that the first service was for all 8 boys that had been killed at the Mercaz Harav Yeshiva and it was "something very big," and broadcast over television and the radio.  E. Hirshfeld Tr. 20.  The second service was a private ceremony for Yonadav, but it drew a crowd of hundreds of people.  E. Hirshfeld Tr. 21.  Elisheva stated that "[i]t was like nothing real," and her family members were "crying and hysterical."  *Id.*

Elisheva and her husband attended a support group comprised of other families dealing with similar attacks, for a period of two years after the incident, which was helpful, and several of her children went to a psychologist, and some went to art therapy for a month or two.  E. Hirshfeld Tr. 21-23.  The family has memorials every year to remember Yonadav — one sponsored by the Mercaz Harav Yeshiva and a more private memorial at the cemetery — and it makes her feel good that Yonadav is not forgotten.  E. Hirshfeld Tr. 23.

Elisheva testified that she and her husband opened an estate for Yonadav in New York State, with Dr. Michael Engleberg as the administrator.  E. Hirshfeld Tr. 23.  *See* Ex. 4 (2/5/2016 Decree granting Limited Letters of Administration issued by New York County Surrogate's Court).

_____

[9] According to Elisheva, the Mercaz Harav Yeshiva campus contains a high school where religious and secular subjects are taught and an institute of "higher learning" where only "holy subjects" are taught. Yonadav was in his first year of studies at the institute. E. Hirshfeld Tr. 14-15.

b. Zemach Hirshfeld, Yonadav's father[10]

Zemach Hirshfeld's recollection of the events of March 6, 2008 follows. Zemach Hirshfeld ("Zemach") is a circumciser by trade but he also volunteers with an ambulance service. Z. Hirshfeld Tr. 39, 42. While on an ambulance call on March 6, 2008, he heard a communication regarding something happening at the Mercaz Harav Yeshiva and the news that many people had been injured. Z. Hirshfeld Tr. 42. Zemach headed back home and waited with his wife and family; he remembers calling the Mercaz Harav Yeshiva and hoping to hear from Yonadav and further, that people were gathering at their family home. Z. Hirshfeld Tr. 42-43. Zemach assumed that Yonadav was safe until the rabbi and social worker arrived, and then he understood that Yonadav was dead. Z. Hirshfeld Tr. 43. Zemach was asked to come to identify the body, and he said that while he seemed strong because he was focusing on what he needed to do, he later had a feeling like he "could not contain or grasp what [was] happening." Z. Hirshfeld Tr. 43-44. He described his feeling at the funeral as follows:

> In the first funeral I had no function or position, just to be - - to fe[el] torn. In the second funeral, I was able to speak for - - or, to give the - - give the - - I cried, I yelled continuously. I prepared ahead of time the headlines of what I was going to say. I felt like I had help from the All Mighty to do it in a good way.

Z. Hirshfeld Tr. 45.

Zemach testified that he had a strong faith that allowed him to have sorrow without frustration and helped him get through the difficulties of dealing with Yonadav's death. *Id.* Zemach participates in the annual memorials for Yonadav, as do some members of the community, and every year when Zemach speaks at the memorials, he tries to take "Yonadav's stories or poems

---

[10] Zemach Hirshfeld is a United States citizen resident in Israel. Z. Hirshfeld Tr. 39.

[ ] to build what [he] ha[s] to say around [them]." Z. Hirshfeld Tr. 46. Zemach misses the "future that will never be" in terms of not seeing who Yonadav would have married or knowing Yonadav's children or "how would be his future." Z. Hirshfeld Tr. 47.

### c. Shalom Hirshfeld, Yonadav's brother[11]

Shalom Hirshfeld ("Shalom") testified live before the Court at the April 24, 2018 bench trial. At the time of Yonadav's death, Shalom was 14 years old. S. Hirshfeld Tr. 54. On the evening of the incident, Shalom was traveling back from a visit to the old city in Jerusalem with his friends and some neighbors when he heard a report on the radio that there was an attack at the Mercaz Harav Yeshiva. S. Hirshfeld Tr. 50, 52. Shalom started trembling uncontrollably as he contemplated whether Yonadav was safe. S. Hirschfeld Tr. 50-51. The neighbors operating the car had a son who also studied at the Mercaz Harav Yeshiva, and the mother was able to contact her son, but she was crying in the car, which added to the "heavy and intense" atmosphere in the car. S. Hirshfeld Tr. 52. When Shalom got home, the atmosphere was "very, very stressed" for several hours. S. Hirshfeld Tr. 52-53. Shalom sat around and drank water to try to deal with his stress, while more and more people began arriving at his family's home. S. Hirshfeld Tr. 53. Finally, the rabbi arrived and Shalom overheard the rabbi's voice along with a loud cry from his mother, and his father asking for verification, and that's when he knew Yonadav had been killed. S. Hirshfeld Tr. 53-54. Shalom slept that night and when he woke up, the "atmosphere at home was very, very heavy." S. Hirshfeld Tr. 54,

---

[11] Shalom Hirshfeld has dual citizenship with Israel and the United States. S. Hirshfeld Tr. 49; *see also* Consular Report of Birth Abroad, ECF 30-8. Each of Yonadav Hirshfeld's eleven other siblings provided evidence of their United States citizenship in the form of a Consular Report of Birth Abroad, which is attached to their individual declaration or deposition.

Shalom testified that Yonadav's death did not seem real until he got off the bus going to the place where Yonadav's funeral service was being held and he saw the death announcement with Yonadav's name on it, and then he started to cry. S. Hirshfeld Tr. 55. The funeral service was crowded with people, and many people from inside and outside of the community came to the family's home to show their respect. S. Hirshfeld Tr. 55. For a period after Yonadav's death, Shalom felt like there "was no room for anything else but the feelings and thoughts about what had happened" and everyone in the family "was confused, [with] very mixed feelings" and family members were laughing and crying over stories about Yonadav. S. Hirshfeld Tr. 56.

Shalom was "very, very close" to Yonadav – he and Yonadav and their brother Elyashiv shared a room. S. Hirshfeld Tr. 54, 58. He and Yonadav had an arrangement whereby they would bike over together or take turns biking over to clean the area around the synagogue. S. Hirshfeld Tr. 58. Shalom looked up to Yonadav as a "perfect person" and recollected his "great sense of humor" and "well-developed imagination" which Yonadav used to make up stories to humor his siblings. S. Hirshfeld Tr. 58-59. Shalom also recalled that Yonadav was a serious student, especially when it came to religious studies. S. Hirshfeld Tr. 59.

d. Zimrat Bracha Zuckerman (nee Hirshfeld), Yonadav's sister

Zimrat Bracha Zuckerman ("Zimrat") is the oldest sibling in the Hirshfeld family, and she was 25 years old when Yonadav died. *See* Transcript of Zimrat Bracha (Hirshfeld) Zuckerman's April 10, 2018 Deposition ("Zimrat Depo."), at 7. Zimrat thinks that she heard about the terrorist attack at Mercaz Harav Yeshiva on an Israeli news website. Zimrat Depo. 8. She contacted her parents, who said that they could not reach Yonadav, but someone had seen him, and Zimrat waited for further information. Zimrat Depo. 9. Zimrat's brother Yedidya later called Zimrat's husband,

and from the exchange on the telephone, that's when she realized that Yonadav had been killed even though no one explicitly said so. Zimrat Depo. 10-11. Zimrat and her husband drove to her family's house, and it was a "very difficult atmosphere" in the car. Zimrat Depo. 11. There were many people at the house and Zimrat stayed there that night with her parents. Zimrat Depo. 12. Zimrat described the Shiva as a "very funny week" when the family kept talking about Yonadav and his jokes and pranks. Zimrat Tr. 14. She indicated that she "[didn't] think [she] had a more special relationship [with Yonadav] than any of the other siblings" although she did "run after him when he was very naughty, when he was younger" and she babysat for him. Zimrat Depo. 14-15. When Yonadav was older, he would show her poems and stories he wrote, and she thought they were funny. Zimrat Depo. 15. To this day, she thinks of Yonadav and the kind of life he might have and the jokes he would have shared with the family, and she remembers the funny stories he would tell during family car rides. Zimrat Depo. 15-16. Zimrat stated that "[b]eyond the loss and the sorrow and the pain," Yonadav's death affected her health insofar as she was pregnant at the time he was murdered, and she developed diabetes. Zimrat Depo. 16. Zimrat never sought any counseling after Yonadav's death. Zimrat Depo. 16-17.

e. Haya Hamital Novik (nee Hirshfeld), Yonadav's sister

Haya Hamital Novik ("Haya") was 24 years old when Yonadav was killed. *See* Transcript of April 10, 2018 Deposition of Haya Hamital (Hirshfeld) Novik ("Haya Depo."), at 7. She learned about the attack at the Mercaz Harav Yeshiva from a neighbor who told her. Haya Depo. 8. Haya called her parents, and they did not have information, so she started praying for Yonadav and others at the Mercaz Harav Yeshiva. Haya Depo. 12. Haya realized that Yonadav had been killed

when her husband's rabbi asked to come and see them, and she "couldn't quite comprehend what was happening." Haya Depo. 13.

Haya described her relationship with Yonadav as her being on "good terms with all [her] siblings" in contrast to having "an unusually special relationship with him." Haya Depo. 9. She remembered Yonadav playing the recorder with his friend and always having a joke to tell when he answered the phone. Haya Depo. 11. She described Yonadav as "very popular" in their family. *Id.* Haya thinks about Yonadav on the anniversary of his death and every time there is a family wedding or celebration. Haya Depo. 13-14. Haya speculates that her brother would have been a rabbi considering his "talents and capabilities." Haya Depo. 17. Haya talked about going to the annual memorials for Yonadav and visiting his gravesite. Haya Depo. 14. Haya's husband has started a non-profit religious organization called "Close to Me" in Yonadav's memory, and its purpose is "to increase the study of Torah among Jewish people." Haya Depo. 17.


f. Yedidya Hirshfeld, Yonadav's brother

Yedidya Hirshfeld ("Yedidya") was 22 years old when Yonadav was killed. *See* Transcript of April 10, 2018 Deposition of Yedidya Hirshfeld ("Yedidya Depo."), at 6. On the evening that Yonadav was killed, Yedidya was at the Mitzpe Yericho Yeshiva, where he was a student, when he heard about the attack at the Mercaz Harav Yeshiva. Yedidya Depo. 8. Yedidya called home and was told that Yonadav had been seen outside the library but that he had not been heard from, so Yedidya should check back in a half hour. Yedidya Depo. 8-9. Yedidya called repeatedly, and a neighbor who answered the phone told him to come home, so he understood that Yonadav had been killed, and he then informed his brother and sister who lived in the same town and were unaware of what had happened. Yedidya Depo. 9-10.

Yedidya described his relationship with Yonadav as good; they were "always very, very happy to meet one another, to be together[,] [a]nd [they] had [their] family jokes that [they] shared[,]" and they studied the Mishna (basis for Jewish law) together. Yedidya Depo. 10 -11. Yedidya was very impressed with Yonadav's knowledge of the Mishna, and he indicated that Yonadav studied seriously and was unusually talented in his knowledge of the Mishna. Yedidya Depo. 11-14. Yedidya misses Yonadav's sense of humor, and he noted that Yonadav was "dominant" within the family in a positive way because he was pleasant and made people laugh, and he was interesting. Yedidya Depo. 13 -14. Yedidya especially misses Yonadav at family celebrations, and he finds it difficult to talk about Yonadav. Yedidya Depo. 14 -15.

g. Hana Shandorfy (nee Hirshfeld), Yonadav's sister

Hana Shandorfy ("Hana") was 20 years old when Yonadav died. *See* Declaration of Hana Shandorfy ("Hana Decl."), at ¶3. Because of their proximity in age, she and Yonadav were very close and had a strong connection; they used to help each other with schoolwork and they were both camp counselors. Hana Decl. ¶¶ 4, 6. Hana described Yonadav as very happy, always laughing, helpful and giving to others, and energetic. Hana Decl. ¶ 5. Hana and Yonadav were confidants who had many conversations, both about serious subjects and day-to-day matters. Hana Decl. ¶ 6. They enjoyed each other's company and had a lot in common. Hana Decl. ¶¶ 4, 6. Hana's mother testified that Hana and Yonadav were "soulmate[s]." E. Hirshfeld Tr. 30.

On the day of the terrorist attack, Hana was at home with her husband and child; when she heard from her brother-in-law about the terrorist attack at the Mercaz Harav Yeshiva, she called her parents. Hana Decl. ¶ 7. Hana's father asked if Hana's husband could try to obtain information about the shooting since he was also a student at the Mercaz Harav Yeshiva and knew a lot of

people, and so Hana's husband made many calls to the Mercaz Harav Yeshiva to get reports of where Yonadav was last seen. *Id.* Hana was worried, and she felt like she was "hanging between hope and despair" and she started to get stomach pains and worried she was going into early labor. *Id.* When she heard that Yonadav had been killed, Hana was in shock and "couldn't digest it." Hana Decl. ¶ 8. Even today, Hana still feels Yonadav's loss and she misses him, dreams about him, and wishes her children could know him. Hana Decl. ¶ 9. Hana indicated that "[a]t every family event there is a strong feeling of something lacking, because Yonadav isn't with us" and she laments that she did not get to see him get married and raise a family. Hana Decl. ¶ 10. Hana's mother testified that Hana was traumatized by Yonadav's death and she was very sad and couldn't accept that someone "so full of life" was gone. E. Hirshfeld Tr. 29. Hana attends the memorials for Yonadav, and she talks to her children about Yonadav. E. Hirshfeld Tr. 30.

h. David Yinon Hirshfeld, Yonadav's brother

David Hirshfeld ("David") was 17 years old when Yonadav was killed. *See* Transcript of April 10, 2018 Deposition of David Yinon Hirshfeld ("David Depo."), at 7. He was in the classroom at the Mitzpe Yericho Yeshiva when he heard about the terror attack at the Mercaz Harav Yeshiva, and he started to worry about his brother Yonadav and his bother-in-law, who also studied there. David Depo. 8. David and his classmates gathered in the hall to recite prayers and David remembers that he was crying for hours because he was so worried. David Depo. 9. Someone said that Yonadav had been seen and that he was okay, so David went to sleep in his dormitory, but it was a "sorrowful atmosphere and a lot of crying." David Depo. 10. David was lying in bed when his brother Yedidya arrived and said they needed to go home. *Id.* They went to Hana's house and David overheard his brother-in-law talking about Yonadav in the past tense

and knew for certain he had been killed, although he felt like he "basically knew it the whole time." David Depo. 10. When he got home, "the dam burst" and they "all burst into tears [and] were crying the whole night, basically all of us together." David Depo. 11. David slept for an hour or two, and he woke up crying. *Id.* At the funeral, he was surrounded by friends, and he alternated between weeping and talking about Yonadav. David Depo. 12. Afterward, David could not eat, and he had a hard time returning to the Mercaz Harav Yeshiva. *Id.* He felt "disconnected" from what was going on, and while he did not seek counseling officially, his friends helped him after Yonadav's death. David Depo. 13-14.

David had difficulty putting his relationship with Yonadav into words, saying that it went "beyond just a relationship with brothers," and it was more of a friendship where David would wait expectantly for Yonadav to return from the Mercaz Harav Yeshiva. David Depo. 14. David described Yonadav as "fun to be with" and "full of life" and "full of humor and joy." *Id.* He noted that he and Yonadav did "silly things together" and Yonadav was a "wonderful person to be with." David Depo. 14-15. David and Yonadav went on hikes and talked and laughed together. David Depo. 15. They had a very close relationship — a strong bond — and they enjoyed spending time together. David Depo. 15-16. David misses seeing Yonadav at family events and he cried at his own wedding when someone mentioned that Yonadav was not there. David Depo. 16. Even today, David still experiences a sense of sorrow, and he feels like he is a more sensitive, empathetic person after the loss of Yonadav. David Depo. 17.


i. Aviya Freedman (nee Hirshfeld), Yonadav's sister

Aviya Freedman ("Aviya") was 15 years old when Yonadav died. *See* Declaration of Aviya Freedman ("Aviya Decl."), ¶ 3. Aviya recalled spending many evenings filled with fun and

laughter with Yonadav, who was "always telling jokes and speaking funny nonsense," Aviya Decl. ¶ 4. She characterized Yonadav as "witty and happy" but she also remembered him studying the Mishna late at night. Aviya Decl. ¶ 4-5. Yonadav was generous to his friends and family and he treated them well. Aviya Decl. ¶¶ 5-6. Aviya remembers him playing his recorder and jumping in the water first on family trips and being so "happy, sociable, full of life." *Id.*

On the day Yonadav was killed, Aviya was with friends and celebrating "Rosh Hodesh" (described by Aviya as "the new Hebrew month"), when her friend mentioned that there had been a terrorist attack in Mercaz Harav Yeshiva. Aviya Decl. ¶ 7. Aviya did not really react until she heard that some boys had been wounded and killed and then she got scared for Yonadav and ran home, where the family was praying and trying to contact Yonadav. *Id.* After the rabbi told the family that Yonadav had died, Aviya felt "great sorrow and confusion" and she could not understand what had happened and felt a "feeling of great loss for the family and the whole nation." Aviya Decl. ¶ 8. Aviya's mother testified that after Yonadav's death, Aviya had a "very hard time in school" and was "in mourning for a long time" and she got sick "with mono the year afterwards," which might have been part of her mourning. E. Hirshfeld Tr. 32.

Aviya misses Yonadav terribly and feels helpless about being unable to "turn the clock back" but she tries to focus on good things that have happened since Yonadav died including "people learning more Torah because of him." Aviya Decl. ¶ 9. Aviya laments the loss that she feels as Yonadav's sister and the "loss for the whole nation because of his special personality." *Id.* She named her son Yonatan, after Yonadav, and she feels sad that Yonadav was not able to get married and have his own children. Aniya Decl. ¶ 10.

j. Nehemiya Hirshfeld, Yonadav's brother

Nehemiya Hirshfeld ("Nehemiya") was 12 years old when Yonadav was killed. *See* Transcript of April 10, 2018 Deposition of Nehemiya Hirshfeld ("Nehemiya Depo."), at 7. On the evening of March 6, 2008, Nehemiya was at home with his family when his mom told him about the attack at the Mercaz Harav Yeshiva. Nehemiya Depo. 8. Nehemiya did not begin to worry immediately because terrorist attacks are quite common, and someone had said that they saw Yonadav, but as the evening went on, he and his parents became more concerned when they were unable to get in touch with Yonadav. Nehemiya Depo. 8-9. After about four hours, the rabbi came to the family's home. Nehemiya Depo. 9-10. Nehemiya did not attach any significance to the rabbi's visit, and he went to bed where he then heard sounds like laughing or crying. Nehemiya Depo. 10. Finally, he overheard someone saying that Yonadav was dead. *Id.* When Nehemiya heard the news, he "felt a chill go through [his] back" and he got "dizzy" and "was trembling." Nehemiya Depo. 11. He felt like he was in shock and did not understand what was going on, and while everyone was crying, he was "withdrawn into [him]self" and crying. Nehemiya Depo. 12. He didn't know what to do so he slept for a little while until one of his brothers came in. Nehemiya Depo.13.

Nehemiya described his relationship with Yonadav as follows:

He was an older brother, someone you play with, someone you have fun with and you do silly things with and you tell jokes to each other. He always knew what to do. We always found something interesting to fill the time with or go on a hike together, play an interesting game.

Nehemiya Depo. 14. Nehemiya testified that Yonadav would make up crazy stories to tell the family and he would share "embarrassing moments that he had had or funny things that he did." Nehemiya Depo. 15.

Nehemiya spoke to a social worker after Yonadav's death, and he received some support from an organization called "One Family," insofar as he felt "that there was someone who cared that we'd lost someone that way." Nehemiya Depo. 16-17. Nehemiya especially misses Yonadav when he goes to his parents' house for Shabbat meals. Nehemiya Depo. 16. Nehemiya does not like being labeled a "bereaved brother," and he indicated also that he had a lot of anxiety and fear about his loved ones in the period after he lost his brother as opposed to a prior feeling that "it wo[ul]n't happen to [them]." Nehemiya Depo. 16, 18. He stated that his family does not talk about Yonadav because "[w]e're a kind of closed people in the family," and responded "[n]o" when asked if he has "engaged in any activities in memory of Yonadav to honor his memory." Nehemiya Depo. 17-19.

### k. Amiel Hirshfeld, Yonadav's brother

Amiel Hirshfeld ("Amiel") was 11 years old when Yonadav died. *See* Declaration of Amiel Hirshfeld ("Amiel Decl."), ¶ 3. Amiel indicated that Yonadav was his "favorite older brother" whom he loved and admired, and he was "deeply affected by his death." *Id.* After Yonadav's death was confirmed, Amiel "knew we would never see him again" but could not believe it, and he felt shocked, but also had "feelings of anger and despair." Amiel Decl. ¶¶ 4-5. Amiel remembers Yonadav vividly, and he considers him his "most talented and possibly my strongest brother," and used to brag about Yonadav to his friends. Amiel Decl. ¶ 6. Amiel's mother testified that Amiel admired Yonadav, was proud to be his brother, looked to him as a role model, and would tell his friends what a great brother Yonadav was. E. Hirshfeld Tr. 33. Amiel and Yonadav had a close relationship and Yonadav "always had some time for [him]." Amiel Decl. ¶ 6. Amiel feels "a deep emptiness" when he thinks of Yonadav, and he misses him and

regrets that he never got to say goodbye. Amiel Decl. ¶ 8. Amiel's mother testified that Amiel attends the memorials for Yonadav every year. E. Hirshfeld Tr. 33.

l. Elyashiv Schmuel Hirshfeld, Yonadav's brother

Elyashiv Schmuel Hirshfeld ("Elyashiv") was 10 years old when Yonadav died. *See* Declaration of Elyashiv Schmuel Hirshfeld ("Elyashiv Decl."), ¶ 3. Elyashiv recollected that Yonadav took him out on his back in the deep water before Elyashiv could swim, and he remembered Yonadav as being "full of life, always telling stories and jokes." Elyashiv Decl. ¶ 3. Elyashiv loved and admired Yonadav and "was deeply affected by his death." *Id.*

When Elyashiv first heard about the attack, he was certain that Yonadav would be alright because he could not imagine him being hurt, and so Elyashiv was able to sleep soundly that night. Elyashiv Decl. ¶ 4. When he awoke the next morning, his parents informed him that Yonadav had been murdered and Elyashiv's reaction was anger, frustration, nausea, and disbelief that he would never see him again. Elyashiv Decl. ¶¶ 4-5. Elyashiv indicated that he remembers Yonadav vividly and the images always stay with him of Yonadav playing chess and racing to Synagogue. Elyashiv Decl. ¶ 6. Elyashiv said he will always miss Yonadav and he feels sad with a "strong sense of loss and emptiness" when he thinks of him. Elyashiv Decl. ¶ 8. Elyashiv's brother Shalom testified that Elyashiv, who shared a room with Shalom and Yonadav, cried a lot during Yonadav's funeral and the death impacted him "very, very hard," and even today, "it's part of his identity" as a bereaved brother. S. Hirshfeld Tr. 54, 57-58.

m. Elisheva Hirshfeld on behalf of minor EH, Yonadav's brother

Minor EH was 7 years old when Yonadav died. *See* Declaration of Elisheva Hirshfeld on behalf of minor EH ("EH Decl."), ¶ 3. EH recalls that Yonadav was playful and kind and that he spent time with him. EH Decl. ¶ 4. EH's mother testified that EH remembers playing with Yonadav and that Yonadav would make up funny stories. E. Hirshfeld Tr. 25. EH remembers when Yonadav styled his hair into a funny look and he still has a feeling of love for Yonadav. EH Decl. ¶ 4. On the night of Yonadav's death, while the family was waiting for word from Yonadav, EH asked everyone in the family to pray together, which they did. EH Decl. ¶ 5. EH remembers asking God not to let Yonadav die and he remembers crying the next day when his parents told him Yonadav was dead. *Id.* EH does not remember his feeling at the time and may not have understood what death was but as he matured, he started missing Yonadav, and sometimes cried because of a strong feeling of sadness and loss. EH Decl. ¶ 6. EH's mother testified that EH did not attend the memorial services for Yonadav for a few years after the death but that he now does, and he misses Yonadav and speaks about him. E. Hirshfeld Tr. 26-27.

n. Elisheva Hirshfeld on behalf of minor SH, Yonadav's brother

SH was 4 years old when Yonadav died. *See* Declaration of Elisheva Hirshfeld on behalf of minor SH ("SH Decl.") ¶ 3. SH remembers playing with Yonadav and doing silly things with Yonadav such as jumping from the ledge into Yonadav's arms or hanging from the top bunk with Yonadav holding him. SH Decl. ¶ 3. SH also remembers Yonadav playing the flute and studying Torah and spending time with Yonadav at family meals. SH Decl. ¶ 4. SH recollects that Yonadav was "always smiling or laughing" and he felt that Yonadav loved him. *Id.* SH was "very confused" by the events surrounding Yonadav's death. E. Hirshfeld Tr. 27. SH did not understand when his

parents informed him that Yonadav was dead but as time passed, he realized what had happened and "felt the loss of Yonadav very acutely." SH Decl. ¶ 5. SH attends the memorials in honor of Yonadav. E. Hirshfeld Tr. 28. SH wonders what life would be like if Yonadav had not died and he speculates that "[m]aybe there would be more happiness." SH Decl. ¶ 5.

The Court finds credible the live testimony by Elisheva Hirshfeld, on behalf of herself and the minor plaintiffs E.H. and S.H, and with respect to plaintiffs Hana, Aviya and Amiel; as well as live testimony by Zemach Hirshfeld and by Shalom Hirshfeld, on behalf of himself and Elyashiv Hirshfeld. The Court finds credible the deposition testimony of: Zimrat Bracha (Hirshfeld) Zuckerman; Yedidya Hirshfeld; Haya Hamital (Hirshfeld) Novick; Nehemiya Hirshfeld; and David Yinon Hirshfed, and the Declarations of Hana Shandorfy, Aviya Freedman, Amiel Hirshfeld, Elyashiv Schmuel Hirshfeld, and Elisheva Hirshfeld on behalf of minor plaintiffs E.H. and S.H.[12] Accordingly, the Court concludes that Yonadav Hirshfeld's parents and siblings have suffered an immense amount of pain and suffering as a result of Yonadav's death and the loss of their son and brother.

Considering the totality of the testimony and other evidence in this case, the Court finds that Plaintiffs have presented ample and sufficient evidence that Hamas was responsible for the attack on the Mercaz Harav Yeshiva on March 6, 2008. Levitt Tr. 101-103 (in an official publication of the al-Qassam Brigades, "Path to Glory," Hamas identified the attacker by picture and by name and provided "details about the [March 6, 2008] attack that glorify[ied] the attacker

---

[12] Elyashiv Schmuel Hirshfeld was a minor at the time this case was filed and when the Complaint was amended, and as such, he was identified by his initials and his claims were asserted by his parents. Currently, he is over 18 years old and identifies his full name and asserts claims on his own behalf.

and the attack." They took unequivocal responsibility for the attack, and that claim of responsibility has not been retracted).[13] Plaintiffs have demonstrated further that this terrorist action would not have been possible without the material support provided to Hamas by Iran. Levitt Tr. 89 ("The majority of Hamas financing in general, and certainly in this period of time [around March 6, 2008] came from Iran . . . and by financing, . . . , I really mean financing and resourcing more generally" which includes not only cash but funding, weaponry, and training.), Clawson Tr. 79 (confirming that Iran provided material support and resources to Hamas in the period immediately before and including March 6, 2008); Levitt Tr. 90 (noting that a British journalist reported just three days after the Mercaz Harav Yeshiva attack that Hamas previously sent some 300 operatives to Iran for training and 150 of them were still there.)

## IV. CONCLUSIONS OF LAW ON LIABILITY

The Court's Conclusions of Law relating to liability proceed in three parts. First, the Court concludes that it has subject matter jurisdiction over Plaintiffs' claims pursuant to the FSIA's terrorism exception, and that Plaintiffs have established satisfactorily their claims for relief under the federal cause of action associated with that exception. Second, the Court concludes that it has personal jurisdiction over the Defendant. Third, the Court concludes that Plaintiffs brought this action in a timely manner and they have a private right of action against Defendant Iran. The Court then discusses the various claims asserted by the Plaintiffs.

---

[13] Similar claims of responsibility have been relied upon in several other cases within this court. *See, e.g., Bluth v Islamic Republic of Iran*, 203 F. Supp. 3d 1, 10 (D.D.C. 2016) ("a Hamas representative claimed responsibility for the Atzmona attack"); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 94 (D.D.C. 2017) ('[W]hen Hamas makes an official claim of responsibility for an attack, the claim has usually been accurate.") Moreover, in *Gill*, as here, the "Qassam Brigade's website include[d] the attack on its list of successful attacks." *Id. See also Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002) ("HAMAS publicly claimed credit for the February 25, 1996 attack. . . .")

## A. Subject Matter Jurisdiction

"The FSIA provides a basis for asserting jurisdiction over foreign nations in the United States." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002) (citation omitted). Pursuant to the FSIA, the Court has "original jurisdiction" over "nonjury civil action[s]" against foreign states "without regard to amount in controversy" if the claims seek "relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a). These elements are clearly satisfied in this case where Plaintiffs did not demand a jury trial, they asserted civil causes of action, and they sought in personam relief against Defendant Iran, which is indisputably a "foreign state." *See generally* Am. Compl.

The question of Defendants' immunity is more complicated. "[A] foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson,* 507 U.S. 349, 355 (1993). "[E]ven if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the [FSIA]." *Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 493 n.20 (1983). In the instant case, Plaintiffs assert that the FSIA's terrorism exception to foreign sovereign immunity applies. The terrorism exception states that:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).

For this exception to apply, Plaintiffs in this case need to demonstrate that they are making a claim for money damages against Iran, a foreign state, for the death of Yonadav Hirshfeld caused by an act of extrajudicial killing carried out by Hamas with material support and resources provided by Iran. Furthermore, the following two requirements must be met: 1) the foreign state defendant must have been designated a state sponsor of terrorism at the time of the act and remain so-designated when the claim was filed or in the preceding six months, §1605A(a)(2)(A)(i)(l); and 2) the claimant or the victim in the case must have been a national of the United States, a member of the armed forces or otherwise employed by the Government of the United States.

§ 1605A(a)(2)(A)(ii).[14] *See, e.g. Roth* v. *Islamic Republic of Iran*, 78 F. Supp. 3d 379, 395 (D.D.C. 2015); *Mohammedi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015).

Some of these elements are clearly satisfied and require little discussion. It is evident that Plaintiffs are making a claim for money damages against Iran, a foreign sovereign, regarding the death of Yonadav Hirshfeld. *See generally* Amended Complaint, ECF No. 7. Turning next to the requirements set forth in Section 1605(a)(2)(A), Iran is now and has continuously been since 1984, designated as a state sponsor of terrorism. On January 23, 1984, in accordance with the Export Administration Act of 1979, Iran was designated by Secretary of State George P. Shultz as a "country which has repeatedly provided support for acts of international terrorism." 49 Fed. Reg. 2836-02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz). This designation is consistent with Section 1605A's definition of "state sponsor of terrorism." 28 U.S.C. § 1605A(h)(6). Iran continues to be designated as a state sponsor of terrorism. *See* U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm (last visited August

---

[14] The arbitration requirement noted in 28 U.S.C. § 1605A(a)(2)(A)(iii) is inapplicable because the act at issue in this case did not "occur[ ] in the foreign state against which the claim has been brought;" *i.e.*, Iran.

20, 2018).  Yonadav Hirshfeld was a United States citizen, and all his family members are United

States citizens.  Accordingly, the two requirements of Section 1605A(a)(2)(A), regarding Iran's

designation as a state sponsor of terrorism and Yonadav Hirshfeld's United States citizenship, are

satisfied.

More analysis is required to determine whether the death in this case was "caused by" an

"extrajudicial killing" or Iran's provision of "material support or resources" for such an act.  28

U.S.C. § 1605A(a)(1).  Plaintiffs assert that the murder of Yonadav Hirshfeld was an extrajudicial

killing that was caused by Iran's material support for the terrorist organization, Hamas.  The Court

concludes that Plaintiffs have presented satisfactory evidence to support each of these assertions.

Under the FSIA, the term "extrajudicial killing" has the meaning given to it in section 3(a)

of the Torture Victim Protection Act of 1991 ("TVPA").  28 U.S.C. § 1605A(h)(7); *Owens v.*

*Republic of Sudan*, 864 F. 3d at 769 (D.C. Cir. 2017).  With respect to "extrajudicial killing," the

TVPA states that:

> For the purposes of this Act, the term "extrajudicial killing" means a deliberated
> killing not authorized by a previous judgment pronounced by a regularly constituted
> court affording all the judicial guarantees which are recognized as indispensable by
> civilized peoples. Such term, however, does not include any such killing that, under
> international law, is lawfully carried out under the authority of a foreign nation.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73.

First, Plaintiffs have presented evidence satisfactory to the Court that Yonadav Hirshfeld

was the victim of an extrajudicial killing.  The Court is satisfied by the evidence presented, as

outlined in detail in the Court's Findings of Fact, that on the evening of March 6, 2008, when

Yonadav Hirshfeld was at the Mercaz Harav Yeshiva in Jerusalem, Israel, talking to his friends

Shimon Balzam and Zvi Yehuda Kofman, a shooter associated with the terrorist group Hamas

opened fire on the three young men.  Yonadav Hirshfeld was shot, and while he ran into a building

to try to escape, he died a short time later due to the wounds he sustained.  Both Shimon Balzam

and Zvi Yehuda Kofman proffered deposition testimony describing in detail the events of that day. Clearly this killing was not authorized by a prior judgment affording judicial guarantees or due process, nor is such deliberate killing lawful under any international law. It is a quintessentially extrajudicial killing. *See Han Kim*, 774 F.3d at 1050 ("[w]ith respect to extrajudicial killing, the Kims need demonstrate only that the DPRK killed the Reverend without due process.").

Finally, the Court is satisfied that Iran, through its officials acting within the scope of their official duties, provided material support or resources to Hamas, and that Yonadav's death was "caused by" this support. The FSIA defines "material support or resources" broadly, as

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). As outlined in the Court's Findings of Fact, Iran provided material support to Hamas by, among other things, being the major source of financial assistance totaling millions of dollars in funding for the organization, providing weapons and training for its members, and encouraging Hamas terrorist attacks against Israel. Moreover, individuals associated with the Iranian regime played direct roles in meeting with Hamas officials in Tehran and the relationship between Iran and Hamas was openly acknowledged. Regarding its finding that Iran provided material support to Hamas, the Court relies heavily on the testimony of expert witnesses Dr. Patrick Clawson and Dr. Matthew Levitt. Circuit courts, including this Circuit, have acknowledged that expert witness testimony "is of crucial importance in terrorism cases" because firsthand evidence relating to terrorist activities "is difficult, if not impossible, to obtain." *Owens v Republic of Sudan*, 864 F. 3d at 787; *see Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F. 3d 1123, 1132-1133 (D.C. Cir. 2004) (jurisdiction satisfied based solely upon the declaration of an expert

witness); *Boim v. Holy Land Found for Relief & Dev.*, 549 F. 3d 685, 704 (7th Cir. 2008) (same); *United States v. Damrah*, 412 F. 3d 618, 625 (6th Cir. 2005) (same).

With respect to the requirement that the killing in this case be "caused by" this material support, "[t]he FSIA's causation requirement is satisfied by a showing of proximate cause." *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 54 (D.D.C. 2008) (citing *Kilburn v. Socialist People's Republic of Iran*, 376 F.3d 1123, 1128-29 (D.C. Cir. 2004)). In applying the language of 28 U.S.C. Section 1605A and specifically the phrase "caused by," the Court notes that this element has been held to be established by showing a "reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." *Valore v Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010). This standard requires a showing of proximate cause rather than showing that the injury would not have occurred "but for" the defendant's actions. *Kilburn*, 376 F.3d at 1128. This Circuit has recently reaffirmed the "proximate cause" standard set out in the *Kilburn* case. *Owens v. Republic of Sudan*, 864 F.3d at 787. The Circuit Court held that proximate cause in the context of this type of case requires first that the "defendant's actions must be a "substantial factor" in the sequence of events that led to plaintiff's injury" and second that the injury "must have been "reasonably foreseeable or anticipated as a natural consequence" of the defendant's conduct." *Owens*, 864 F.3d at 794 (citing *Rothstein v UBS*, 708 F.3d 82, 91 (2d Cir. 2013)). Proximate cause does not require the plaintiff to show that the defendants specifically intended the injury and thus, whether the state sponsor of terrorism "either specifically intended or directly advanced" the attack at issue in this case is not relevant. *Owens*, 864 F.3d at 799.

In the instant case, there is more than a "reasonable connection" between Iran's provision of material support, in the form of financing, weapons, training and ideological support, and the

act of terrorism in this case. Plaintiffs presented expert testimony that Iran's support of Hamas was given to allow this group to commit precisely the type of militant terrorist act in Israel as occurred in this case. Clawson Tr. 74 (Hamas was founded in 1987 to carry out militant attacks against Israel, and Iran turned to Hamas as the "principal instrument" they used to sponsor terrorist attacks against Israel); Levitt Tr. 91 (Mere days before the attack, U.S. officials were discussing how Iran provided the majority of Hamas's financing); Levitt Tr. 92 (Once Hamas's political wing won elections in 2006, and then took over the Gaza Strip by force of arms from other Palestinian forces, "Iran increased support again, especially in terms of the provision of weapons, which were smuggled through Sinai into the Gaza Strip through tunnels dug underneath the Gaza-Egyptian border."); Levitt Tr. 107 (testifying that "one of the things that was most important to Hamas was to be able to have what we in the United States might describe as a 'train the trainer program.'"); Clawson Tr. 76 ("[O]n the Sunday after this attack, there was an article in the *Sunday Times* of London by a very noted correspondent . . . who said there had been 150 people from Hamas's military wing who at that point had been trained in Iran).

The Court finds that Iran's provision of material support and resources to Hamas was a substantial factor in the events that led to the incident at the Mercaz Harav Yeshiva whereby eight young men were killed. Clawson Tr. 75 ("[S]tarting in 1993, Iran provided material support to Hamas, and to help Hamas develop sophisticated expertise that allows it to carry out more deadly terrorist attacks."); Levitt Tr. 112 ("What we mean by material support [provided by Iran to Hamas] is the provision of the multiple types of support to . . . a foreign terrorist organization [which] would include funds, actual money, in-kind services, and other things like weapons or their services or benefits."); Levitt Tr. 110-111 (noting that Iran provided "[m]illions of dollars [ ] [a]round this time, at a minimum, many tens, probably in the low hundreds of millions of dollars"

and further that it is more "if you start to try and quantify the monetary value of goods, of rockets or other things" provided to Hamas).

The Court further finds that the terrorist incident at the Mercaz Harav Yeshiva by Hamas was reasonably foreseeable because of Iran's conduct. Clawson Tr. 75 ("[A]fter Hamas took over the Gaza Strip in 2007, . . . we saw the head of Hamas visiting Tehran and we saw a lot of assistance coming from Iran to Hamas . . . [and] just a few days before the episode that brings us here today, then secretary of state Condoleeza Rice said it was very clear that Iran was arming Hamas."). In describing what Iran gets out of the material support it provides to Hamas, Dr. Levitt responded that:

> Iran is quite explicit in its desire to eradicate the State of Israel; it's very clear on this topic, through and including to today. . . . What it gets out of the support is being able to have proxies who are frontline combatants with Israel . . . Having terrorist groups like . . . Hamas on the West Bank and the Gaza Strip able to carry out attacks there and, of course, in Israel proper, including, as we saw in this instance in Jerusalem, enables Iran to be able to have a long arm to attack Israel, which, unfortunately, is a stated goal of that regime.

Levitt Tr. at 93.

Accordingly, Plaintiffs have satisfied the two parts of the standard set out in *Owens* —that Iran's provision of material support was a substantial factor in the sequence of events leading to Yonadav's death, and that the shooting at the Mercaz Harav Yeshiva, which resulted in Yonadav being murdered, was reasonably foreseeable or anticipated as a consequence of Iran's actions. Having determined that Iran provided material support to Hamas, and that this support caused the acts of extrajudicial killing at issue in this case, the Court concludes that it has subject matter jurisdiction over Plaintiffs' claims under the FSIA's terrorism exception.

## B. Personal Jurisdiction

The Court also has personal jurisdiction over Defendant Iran. "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction

under subsection (a) where service has been made under section 1608 of this title." 28 U.S.C. § 1330(b). The Court has already concluded that it has subject matter jurisdiction over the claims in this case. Moreover, service has been made under section 1608. On October 10, 2017, the Court issued a Memorandum Opinion and Order in which it found that Iran must be treated as a "foreign state" amenable to process under Section 1608, and that Plaintiffs had accomplished service under Section 1608(a)(4). Memorandum Opinion and Order, ECF No. 27. The Court incorporates by reference the analysis in that Memorandum Opinion and accordingly concludes that this Court has personal jurisdiction over the Defendants. There are no due process concerns raised by the Court's exercise of personal jurisdiction over the Defendant because "foreign states are not "persons"' protected by the Fifth Amendment." *Price*, 294 F.3d at 96.

### C. Timeliness

There is a limitations provision in Section 1605A(b), which sets forth the time during which an action "may be brought or maintained." 28 U.S.C. § 1605A (b). This limitations provision is not jurisdictional. *See Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 328-332 (D.D.C. 2014). This section provides that an action may be brought "10 years after the date on which the cause of action arose." 28 U.S.C. Section 1605A(b)(2). In this case, the attack that gives rise to this civil action occurred on March 6, 2008, and the Complaint was filed on July 10, 2015, less than 10 years after the date the cause of action arose. Accordingly, the Plaintiffs' claims are timely under section 1605A of the FSIA.

### D. Plaintiffs' Private Right of Action

There is a federal private right of action against designated state sponsors of terrorism for enumerated categories of persons, including "a national of the United States' or his "legal representative" for "personal injury or death caused by . . . that foreign state . . . for which the

courts of the United States may maintain jurisdiction . . . for money damages.[15]  28 U.S.C. § 1605A(c).  Section 1605A's private right of action has four basic requirements relevant to the Plaintiffs in this case: (1) an extrajudicial killing, . . , or the provision of material support or resources for such an act where (2) the foreign state provided such support, and the act (3) caused a person death (4) for which courts of the United States may maintain jurisdiction under this section for money damages.  28 U.S.C. § 1605A(a)(1), 28 U.S.C. § 1605A (c).  These requirements for a private right of action have already been discussed in detail in connection with jurisdiction.

The individual plaintiffs in this case may pursue section 1605A(c)'s private right of action as they are all United States citizens.  28 U.S.C. Section 1605A(c)(1).  Michael Engelberg, who is a New York state resident (Am. Compl. ¶ 10) and may be a United States citizen, is before this Court in his capacity as administrator of Yonadav Hirshfeld's Estate, and because Yonadav Hirshfeld was a United States citizen, Mr. Engelberg qualifies under subsection (c)(4) of 28 U.S.C. Section 1605A (whereby the legal representative of a national of the United States may maintain a private right of action).

### E. Plaintiffs' Theories of Recovery

While Section 1605A(c) provides a private right of action, it does not provide guidance on the substantive bases for liability to determine Plaintiffs' entitlement to damages.  As noted by the Honorable Royce C. Lamberth in *Roth:*

> [T]he court is not given the authority (or duty) to articulate "federal common law." *Valore*, 700 F. Supp. 2d at 76.  Instead, because liability under section 1605A(c) is based on "statutory rights," federal judges are instructed to "find the relevant law, not to make it." *Bettis v. Islamic Republic of Iran*, 315 F.3d 323, 333 (D.C. Cir. 2003).  Thus, judges may not "fashion a complete body of law" in considering claims under section 1605A(c).  *Id.* Based on the D.C. Circuit's guidance, district courts in this jurisdiction "rely on well-

---

[15] A "national of the United States" means a "citizen of the United States" or a person owing "permanent allegiance" to the United States, as per the definition set forth in 8 U.S.C. § 1101(a)(22).  28 U.S.C. § 1605A (h)(5).

established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions" to define the elements and scope of these theories of recovery. *Oveissi*, 879 F. Supp. 2d at 54 (quoting *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009)).

*Roth*, 78 F. Supp. 3d at 399.

The plaintiffs in this action bring claims under 28 U.S.C. Section 1605A(c), on behalf of themselves and/or the Estate of Yonadav Hirshfeld, for wrongful death, survival, and intentional infliction of emotional distress/solatium. Amended Complaint, ECF No. 7.[16] Plaintiffs also plead these claims arising under undefined "state law." Plaintiffs can only have one recovery for their injuries, regardless of the number of theories upon which they base their complaint. *See Kassman v. Am. Univ.*, 546 F. 2d 1029, 1034 (D.C. Cir. 1976) ("Where there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of parties whom or theories which the plaintiff pursues.") In this case, Defendant Iran is liable to Plaintiffs under Section 1605A(c) and that subsection explicitly provides for the type of damages that Plaintiffs seek in relation to these claims —economic damages, pain and suffering, solatium, and punitive damages — and thus, the Court will proceed only based on the section 1605A(c) claims.

Prior to discussing the Plaintiffs' claims, the Court will determine whether Yonadav's estate — *i.e.,* Michael Engelberg, in his capacity as administrator of the Estate of Yonadav Hirshfeld — has standing to recover for harms suffered after Yonadav was shot and prior to his death.

---

[16] The Amended Complaint also includes a claim for loss of consortium damages, but a loss of consortium often requires that the party complaining of the loss must have been married to the victim-spouse at the time the cause of action accrued, and decedent Yonadav Hirshfeld was unmarried. Nor did Plaintiffs proffer any evidence related to a loss of consortium claim.

### 1. Standing of the Estate

The determination as to whether an estate may maintain a cause of action for injuries suffered during a decedent's life is governed by the law of the state where the estate is established. *Taylor v Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12-13 (D.D.C. 2011). State law governs this issue because it is not related to the nature and extent of the claims, but rather, it involves a threshold inquiry regarding the "power of the estate to bring and maintain legal claims." *Id.* at 12. The Estate of Yonadav Hirshfeld ("the Estate") was admitted to probate in New York State. *See* Mot. for Default Judg., ECF No. 30, Ex. 4 (Letters of Limited Administration appointing Michael Engelberg as Fiduciary, issued by Surrogate's Court, County of New York, on Feb. 5, 2016). Under New York state law, an estate is entitled to assert claims for "survival damages" that consider decedent's pain and suffering prior to death. *Anderson v Islamic Republic of Iran*, 753 F. Supp. 2d 68, 82-83 (D.D.C. 2010); *In re Estate of Maier*, 682 N.Y.S. 2d 831, 833, 178 Misc. 2d 1061, 1064 (N.Y. Sur. 1998) ("An action for personal injuries belongs to the victim of those injuries and survives the victim's death as an asset of the estate enforceable by its personal representative. . . .") Furthermore, the personal representative of a decedent may maintain an action to recover for damages for wrongful death. *Barry & Sons, Inc. v. Instinct Productions, LLC*, 15 A.D. 3d 62, 66, 788 N.Y.S. 2d 71 (1st Dept. 2005); *see also* N.Y.E.P.T.L. § 5-4.1 (McKinney 2003) . Unlike damages for pain and suffering, damages for wrongful death do not accrue to the estate but go directly to distributees of the deceased. *Heslin v. Country of Greene*, 896 N.Y.S.2d 723, 727-728, 923 N.E.2d 1111, 1115-1116 (2010). When a deceased dies intestate and leaves neither spouse nor children, the parents are his "distributees," N.Y.E.P.T.L. § 4.1.1(a)(4) (McKinney 2003).

## 2. Wrongful Death

Plaintiffs seek recovery of economic losses accruing to the Estate of Yonadav Hirshfeld based on a claim of wrongful death. A decedent's heirs at law, acting through the decedent's estate, may bring a wrongful death action under section 1605A(c) to seek compensation "for economic losses which result from decedent's premature death." *Valore*, 700 F. Supp. 2d at 78 (quoting *Flatow*, 999 F. Supp. at 27.) Plaintiffs may recover for wrongful death upon establishing that Iran caused Yonadav Hirshfeld's death. *See* Restatement (Second) of Torts § 925. As noted above, under New York law, any damages for wrongful death accrue not to an estate, but directly to its "statutory distributees" of the deceased. *In re Jackson's Estate*, 335 N.Y.S. 2d 587, 590, 71 Misc. 133, 134 (NY Sur. Court, Kings County 1972) (citing *Matter of Maynard*, 37 Misc. 2d 184, 234 N.Y.S. 2d 282). In this case, Yonadav Hirshfeld's parents, are his "statutory distributees" because he died intestate and had neither spouse nor children. As previously discussed in this Memorandum Opinion, Plaintiffs have submitted satisfactory evidence demonstrating that Yonadav Hirshfeld's death was an extrajudicial killing effectuated by Hamas, which was receiving material support from Defendant Iran. Accordingly, Iran is liable for the economic losses resulting from Yonadav's premature death, and any damages awarded for wrongful death are recoverable by Yonadav Hirshfeld's parents, Elisheva and Zemach Hirshfeld.

### 3. Survival

A survival action accrues upon the death of an injured person and "limits recovery for damages for loss or impairment of earning capacity, emotional distress and all other harms, to harms suffered before death." Restatement (Second) of Torts § 926. The Estate of Yonadav Hirshfeld seeks damages for Yonadav's pain and suffering between the moment of the shooting,

which injured him, and his ultimate death. Courts have awarded damages for "the victim's pain and suffering that occurred between the attack and the victim's death shortly thereafter." *Haims v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006). An award of pain and suffering is inappropriate "[i]n the absence of evidence tending to show an attack resulted in the fatal but noninstantaneous injury of a victim and that the victim was conscious thereafter[.]" *Worley v. Islamic Republic of Iran*, 177 F. Supp. 3d 283, 286 (D.D.C. 2016); *see Roth*, 78 F. Supp. 3d at 402 (If the plaintiff cannot prove that the decedent consciously experienced time between an attack and subsequent death, a court must refuse to award damages for pain and suffering).

In this case, there was testimony by Shimon Balzam and Zvi Yehuda Kofman that Yonadav Hirshfeld was conscious after he was shot but before he died, which is further demonstrated by the fact that Yonadav was able to run away from the shooter and into the stairwell of a nearby building, where he was later found dead. Balzam Depo. 12; Kofman Depo. 14-17. Mr. Kofman noted that while they were running from the shooter, Yonadav's blood "sprayed onto [Mr. Kofman's] arm" and Yonadav didn't say anything but he thought Yonadav shouted. Kofman Depo. 13. Mr. Balzam testified that Yonadav may have survived for up to 20 minutes after he was shot, as that is the time it took the emergency services to arrive. Balzam Dep. 13-15; Kofman Depo. 17. Mr. Balzam was shot during the March 6, 2008 incident, and he testified that he thought he was going to die from his injuries and he was "very scared." Balzam Depo. 13-14. He agreed that it was reasonable that Yonadav would have had similar thoughts after being shot. Balzam Depo. 15. These statements made under oath by two classmates who were with Yonadav at the time of the terrorist incident at the Mercaz Harav Yeshiva illustrate that the shooting which ultimately led to Yonadav's demise did not kill him instantaneously. The testimony demonstrates further that Yonadav experienced

pain and suffering from the attack at the Mercaz Harav Yeshiva prior to his death, and his Estate is thus able to claim survival damages.

### 4. Intentional Infliction of Emotional Distress/Solatium

Plaintiffs seek to recover solatium damages on their claims against Defendant Iran for intentional infliction of emotional distress ("IIED"), which is a cause of action recognized as giving rise to liability under the FSIA.[17] *See Reed*, 845 F. Supp. 2d at 212 ("An act that would otherwise constitute IIED gives rise to liability under the FSIA."). Plaintiffs have alternately asserted claims for IIED and solatium in their Fourth Cause of Action in the Amended Complaint. Solatium is "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) (citations omitted). Spouses and relatives in direct lineal relationships are presumed to suffer damages for mental anguish insofar as "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Id.* (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)); *see Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 94 (D.D.C. 2014) (Recovery for solatium is generally limited to "immediate family members — parents, siblings, spouses, and children[.]") "Solatium claims are typically brought by family members who were not present or injured themselves." *Cohen*, 238 F. Supp. 3d at 84.

Under 1605A (c) "a solatium claim is indistinguishable from an IIED claim." *Valore*, 700 F. Supp. 2d at 85 (citation omitted); *see also Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d

---

[17] The Court addresses Plaintiff's IIED and solatium claims as one claim. *See Kassman*, *supra.* (permitting only one recovery for a single injury).

260, 269 n.8 (D.D.C. 2002) ("[i]n an intentional homicide case such as [a terrorist killing], solatium appears in any event to be indistinguishable from the intentional infliction of emotional distress for which the District of Columbia does generally allow recovery in tort") (internal quotation marks omitted). Courts can therefore look to cases analyzing either type of claim for guidance on the other. *Valore*, 700 F. Supp. 2d at 85. The standard for an IIED claim in a Section 1605A(c) case draws heavily upon principles set forth in the Restatement (Second) of Torts whereby defendants are liable for IIED if they "by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress" to the plaintiffs. Restatement (Second) of Torts § 46(1). The Restatement permits recovery not only by persons who are the recipients of the "extreme and outrageous conduct," but also by: (1) members of the victim's immediate family (2) who were present at the time of the extreme and outrageous conduct. *Murphy v Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75 (D.D.C. 2010) (citing Restatement (Second) of Torts § 46(2)(a)).

In FSIA cases, the "immediate family" prong is construed strictly to generally permit recovery only by spouses, parents, siblings and children. *Id.* In contrast, the prong requiring presence has been waived because acts of terrorism are sufficiently extreme and outrageous to demonstrate that they are intended to inflict severe emotional harm on even those persons who are not present during the act. *See Valore,* 700 F. Supp. 2d at 80 (the family members "need not be present at the time of a terrorist attack upon a third person to recover for several emotional injuries suffered as a result."); *see also* Restatement (Second) of Torts § 46, cmt. 1 (Am. Law Inst. 1977) (leaving "open the possibility of situations in which presence at the time may not be required").[18]

_____

[18] The appellate court in this circuit recently considered state-law claims for IIED brought against Sudan and Iran by foreign family members of victims of the United States embassy bombings in Tanzania and Kenya, where the issue of waiving the "presence" requirement was challenged by defendant Sudan. *Owens v. Republic of Sudan*, 864 F. 3d 751, 809-812 (D.C. Cir.

The plaintiffs herein, who are the parents and siblings of Yonadav Hirshfeld, have stated undisputed claims for IIED/solatium, as supported by their sworn testimony regarding the shock and anguish they suffered stemming from circumstances surrounding Yonadav's death. When considering claims of solatium/IIED by Yonadav's parents, this Court may presume that those in direct lineal relationships with victims of incidents of terrorism suffer compensable mental anguish. *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 30 (D.D.C. 1998) (discussing solatium damages under a prior version of the statutory state-sponsored terrorism exception to foreign sovereign immunity). Regarding claims by Yonadav's siblings, the Court notes that testimony providing a "close emotional relationship" will usually be sufficient to sustain an award of solatium damages. *Id.*

The evidence in this case establishes that Iran provided material support and resources to Hamas with the understanding and intent that Hamas would carry out attacks in Israel, where such attacks would cause a high degree of emotional distress. *See. e.g. Valore*, 700 F. Supp. 2d at 77 ("Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress.") (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)); *Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d 1, 12 (D.D.C. 2008) ("Defendants' conduct, in providing material support . . . [to] Hamas to conduct suicide bombings,

---

2017), *petition for cert. filed*, 864 F.3d 751 (Mar. 6, 2018) (No. 17-1406). The Circuit Court noted that this matter of "abandoning the presence requirement in FSIA terrorism cases" remains undecided and further, that in the case of state law claims, D.C. law controls the scope of the IIED claim, but the D.C. Court of Appeals "has yet to render a decision on the matter." *Id.* at 811-812. Accordingly, the following question was certified to the D.C. Court of Appeals:

Must a claimant alleging emotional distress arising from a terrorist attack that killed or injured a family member have been present at the scene of the attack in order to state a claim for intentional infliction of emotional distress?

*Id.* at 812.

is extreme, outrageous and goes beyond all possible bounds of decency.") "[B]ecause of the appalling and extreme nature of terrorist attacks, courts in this district have generally held that a defendant is liable to the victim's family even if they were not physically present during the attack as long as there is some evidence that they suffered mental anguish and trauma as a result of it." *Cohen*, 238 F. Supp. 3d at 85 (citations omitted), *Roth v Islamic Republic of Iran*, 78 F. Supp. 3d at 400 (same); *Valore*, 700 F. Supp. 2d at 80 (same). Accordingly, Iran is liable to Yonadav Hirshfeld's family members on claims for intentional infliction of emotional distress/solatium.

Plaintiffs have thus established Iran's liability to the Plaintiffs under the federal private right of action against state sponsors of terrorism, 28 U.S.C. Section 1605A(c), on claims for wrongful death, survival, and intentional infliction of emotional distress/solatium. The damages allowable to the plaintiffs are discussed in the section that follows.

## V. CONCLUSIONS OF LAW ON DAMAGES

The Plaintiffs in the instant case seek to recover economic, pain and suffering, solatium, and punitive damages to compensate for their losses and to punish Defendant Iran for its support of Hamas, a terrorist organization. To recover under the FSIA, a "default winner must prove damages 'in the same manner and to the same extent as any other default winner.'" *Hill v. Republic of Iraq*, 328 F. 3d 680, 683-84 (D.C. Cir. 2003) (citation omitted). In the context of a default judgment, courts in this circuit distinguish between "the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages." *Rhodes v United States*, 967 F. Supp. 2d 246, 313 (D.D.C. 2013) (emphasis in original). In terms of future damages, "successful plaintiffs may recover damages by proving 'that the projected consequences are reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate.'" *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018)

(citing *Hill*, 328 F.3d at 684).   For past losses, plaintiffs must "prove the fact of injury with reasonable certainty," while the amount of damages may be based on a "reasonable estimate." *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997).

As previously noted, damages under Section 1605A(c) include "economic damages, solatium, pain and suffering, and punitive damages."  The heirs of a deceased plaintiff may recover economic losses stemming from the wrongful death of the decedent, while immediate family members may recover solatium damages for their emotional injury, and all plaintiffs can recover punitive damages. *Valore*, 700 F. Supp. 2d at 83.  The decedent's estate may recover damages for pain and suffering if it can be proved that the decedent experienced pain and suffering prior to his death. *Elahi v Islamic Republic of* Iran, 124 F. Supp. 2d 97, 112 (D.D.C. 2000).   In fashioning damage awards, "courts may look to expert testimony and prior awards for comparable injury" to determine the appropriate amount of compensatory damages. *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 82 (D.D.C. 2017).

**A. Economic Damages**

Section 1605A(c) authorizes courts to award economic damages for lost earnings suffered because of a terrorism victim's death. *See Belkin*, 667 F. Supp. 2d at 24 (considering calculations that relied on reasonable and well-founded assumptions about the likely earnings of the decedent). As a general rule, loss of accretion damages are calculated by estimating a decedent's future earning potential based on the individual's work and education and adjusting that amount to account for inflation, rise in productivity, job advancement, and personal consumption. *Stethem v Islamic Republic of Iran*, 201 F. Supp. 2d 78, 87 (D.D.C. 2002).  The report of an economist may "provide a reasonable basis" for determining the amount of economic damages due under Section 1605A(c). *Reed*, 845 F. Supp. 2d at 214.  Lost earnings are not difficult to quantify, but they must

be supported by competent evidence, or they will be denied. *Braun*, 228 F. Supp. 3d at 83; *see also Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 40-42 (D.D.C. 2010) (declining to award economic damages because the plaintiffs "failed to meet the minimum evidentiary threshold supporting their respective claims for economic damages.")

In the instant case, Plaintiffs introduced the deposition testimony of Mark Berenblut, a forensic and investigative accountant educated at the London School of Economics, and "qualified in Canada and [ ] in the U.S. as [having] an investigative accountant specialty." *See* Transcript of April 10, 2018 Deposition of Mark Berenblut ("Berenblut Depo."), at 5. Mr. Berenblut has previously testified as an expert witness on economic damages in personal injury or wrongful death cases, and he testified as an expert in ten matters during the last four years. *Id.*, *see also* Berenblut Depo., Ex. B [list of matters]. Mr. Berenblut's publications and presentations are listed in his curriculum vitae, which is attached to his report (Berenblut Depo., Ex. A). He previously authored a text called <u>Proving Economic Loss</u>, which was a "loose-leaf service updated every year of twice a year, although he [has not] done it now for a number of years" and that text dealt with "calculation of losses in personal injury, fatality, medical malpractice type of cases." Berenblut Depo. 6.

Mr. Berenblut used two different models to calculate lost earnings on behalf of Yonadav Hirshfeld. In the first model, Mr. Berenblut assumed that Yonadav would have had a career in Israel, and in the second model, he assumed that Yonadav would have had a career in the United States, because he had dual citizenship.[19] Berenblut Depo. 8. Mr. Berenblut's calculation of Yonadav's lost earnings may be summarized as follows:

> [T]he total losses, depending on the level of achievement that one determines for Yonadav, in the U.S. would be the present value of those losses after taxes, after personal

---

[19] As noted by Yonadav's brother Nehemiya, "Yonadav was the only one who spoke English well." When they visited their grandmother who only spoke English, Nehemiya wanted Yonadav "to come with us so he could speak better." Nehemiya Depo. 14.

consumption, of between 2.2 million U.S. dollars and 3.2 million U.S. dollars, as shown in Table 1. And the alternative is, had he made a career in Israel, that those losses would be between approximately 950,000 U.S. dollars and 1.3 million U.S. dollars.

Berenblut Depo. 9.

In making these assessments, Mr. Berenblut considered the following: Yonadav's birthdate and date of death; his dual citizenship; his academic performance in high school ("top marks in all of his topics at the highest level"); and the size of Yonadav's family and academic and career achievements of the family members. Berenblut Depo. 11-12. He then looked at averages for male earners with 16-plus years of school, in Israel and the United States, including not only earnings but also benefits. Berenblut Depo. 13-14. In his Israel model, Mr. Berenblut also looked at "male managers with 16-plus years of schooling as the alternative." Berenblut Depo. 13. In his United States model, Mr. Berenblut "looked at the third quartile, which is an upper quartile" to get another range which he thought "reasonable to measure [Yonadav's] earning capacity." Berenblut Depo. 13-14. He next factored in taxes and personal consumption, and he applied a present value factor and considered government-sponsored pension plans. Berenblut Depo. at 14-15. Mr. Berenblut opined that Yonadav could have achieved higher earnings than in his report, and he characterized his numbers as a "conservative range of estimates." Berenblut Depo. 15-16.

When Yonadav Hirshfeld was killed, he was an 18-year old student studying at the Mercaz Harav Yeshiva. Yonadav's father testified that Yonadav was studying "the Talmud in a very intense way" at the Mercaz Harav Yeshiva. Z. Hirshfeld Tr. 47. In response to a question about what Yonadav was planning on doing after he completed his studies, Zemach said that "It was] the first year of yeshiva studies, so it's too young to know what he would have done with it later." *Id. See also* Haya Dep. 17 ("[B]ased on his talents and capabilities, he would have grown

up to be a Torah leader, a rabbi, someone who would have taught many, many others."); Yedidya Depo. 12 (Yonadav had a superior knowledge of the Mishnah and a real talent for memorizing it, to the extent that "[e]ven older students in the yeshiva . . . . would come to him to ask him where certain things were written and what they meant, to explain them. . . ."). The testimony presented by Yonadav's parents and siblings is consistent in demonstrating that Yonadav was a student who excelled in his studies in high school and was serious about his studies, particularly his religious studies.

The suggested economic award amounts differ based upon two major factors: (1) whether Yonadav would have pursued his career in the United States or Israel; and (2) whether his prospective career would have been comparable to all male earners with the same amount of education, or to male earners at the managerial level with the same amount of education. Because Yonadav was only eighteen years old and in his first year at the Mercaz Harav Yeshiva when he died, it is more difficult to gauge what career path he would have eventually taken. To aid in a determination of appropriate economic damages, this Court considers the facts that are evident from the record: (1) Yonadav was serious about his religious studies and showed a particular aptitude and interest in these studies (E. Hirshfeld Tr. 12-13, Z. Hirshfeld Tr. 41-42, S. Hirshfeld Tr. 59, Yedidya Depo. 11-14); (2) most, if not all, of Yonadav's brothers studied at a yeshiva and some, including his father, are involved in professions that revolve around the Jewish religion (Z. Hirshfeld Tr. 39, S. Hirshfeld Tr. 49-50, Yedidya Depo. 6-7, David Depo. 6, 8, Nehemiya Depo. 6-7) ; and (3) all Yonadav's sibling and his parents live in Israel, and there is no indication in the record before this Court that Yonadav had ever been to the United States or had any desire to go to the United States.

Given these facts, the Court concludes that the damage estimate based on Yonadav pursuing a career in Israel and comparing Yonadav's earning to all male earners (which would encompass male earners pursuing professions such as a rabbi or a teacher) is the one that is better supported by the evidence in this case, and therefore, the Estate of Yonadav Hirshfeld shall receive an economic loss damage award of $950,000.00.

**B. Pain and Suffering**

Claims "for the conscious pain and suffering" inflicted on victims of terrorism are "actionable through their estates." *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 72 (D.D.C. 2008). Courts "will not simply award what [is] abstractly [found] to be fair," *Weinstein*, 184 F. Supp. 2d 13, 23 (D.D.C. 2002), even while "[p]utting a number on these kinds of harms can be difficult." *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 134 (D.D.C. 2005). Courts look to "damage awards for pain and suffering in other cases brought under the FSIA" with the effect that "precedence guides [ ] calculations." *Id*. "In awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards." *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 48 (D.D.C. 2012) (quoting *Valore*, 700 F. Supp. 2d at 84).

Proceeding on this basis, a review of relevant precedents reveals the importance of whether a fatal injury was instantaneous. If a fatal injury was not instantaneous, a court must refuse to award damages for pain and suffering if the plaintiff is unable to prove that the decedent consciously experienced the time between an attack and his death. *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 244 (D.D.C. 2012). If the plaintiff does prove the decedent's conscious state, courts have awarded damages of one million dollars for periods of pain and suffering lasting anywhere from less than a minute to a few hours after an attack but prior to

death. *Braun*, 228 F. Supp. 3d 64, 83 (D.D.C. 2017); *see e.g. Stethem v Islamic Republic of Iran*, 201 F. Supp. 2d at 89 (awarding $1,000,000 for the several minutes after the victim was shot and before he died); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, *5, *8 (D.D.C. 2000) (awarding compensatory damages of $1,000,000 each for "several minutes" of pain and suffering by two decedents who died at the scene of a bombing); *Elahi v. Islamic Republic of* Iran, 124 F. Supp. 2d 97, 113 (D.D.C. 2000) (awarding $1,000,000 for 3-4 minutes of pain and suffering); *Flatow*, 999 F. Supp. at 28-29 (awarding $1,000,000 for 3 to 5 hours of pain and suffering).

Shimon Balzam and Zvi Yehuda Kofman testified that Yonadav Hirshfeld was alive for at least several minutes after being shot, as demonstrated by the fact that Yonadav ran from the place where he was shot into a building that was located approximately 14-20 meters away and he was able to make it another 4 meters into the stairwell landing before he fell. Balzam Depo. 11-12; Kofman Depo. 13-14, 16-18. While the three students were running away from the shooter, Mr. Kofman heard Yonadav scream in pain or fear, and he felt Yonadav's blood spraying onto his shirt. Kofman Depo. 13,17, 23. Neither Mr. Balzam nor Mr. Kofman could say exactly when Yonadav died but at the time emergency services arrived, approximately 20 minutes after the incident, Yonadav was deceased. Balzam Dep. 13-15, 29; Kofman Depo. 15-17. In this case, it is clear from the evidence that Yonadav was conscious, fearful and suffering for at least a few minutes after he was shot because he was able to run away from the shooter and into a building and then make it to the stairwell, where he was later found deceased. Accordingly, Yonadav Hirshfeld's Estate is entitled to $1,000,000.00 in survival damages for Yonadav's pain and suffering after the attack and prior to his death.

## C. Solatium

In this Circuit, the "seminal opinion explaining the origins and particulars of solatium damages" in claims under the FSIA is *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998). *Fraenkel*, 892 F. 3d at 356. As explained therein, "[s]olatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society [which] began as a remedy for the loss of a spouse or a parent [but] has since expanded to include the loss of a child." *Flatow*, 999 F. Supp. at 29. For solatium claims based on the loss of a sibling, the claimant must "prove a close emotional relationship with the decedent." *Id.* at 30. Solatium encompasses the "mental anguish, bereavement and grief resulting from the fact of the decedent's death," and because damages for mental anguish are fact-dependent, these claims require case-by-case analysis. *Flatow*, 999 F. Supp. at 30. When a terrorist act results in death, that emotional distress, "with its attendant horrific surrounding circumstances, prevents the anguish [felt by a relative of the deceased] from subsiding." *Id.* at 31. Solatium damages are therefore available as compensation for the "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as a result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort." *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011) (internal quotation marks and citation omitted). Solatium damages are available even though those plaintiffs were not "present at the place of outrageous conduct." *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009) ("*Heiser II*").

In situations where the victim was killed as opposed to being injured, factors considered by courts include: "(1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical

treatment for depression and related disorders resulting from the decedent's death; (4) the nature (i.e., the closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimants' mental anguish in excess of that which would have been experienced following the decedent's natural death." *Stethem*, 201 F. Supp. 2d at 89-90. Courts put emphasis on the cause of death in terrorism cases, when considering that "the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time." *Elahi*, 124 F. Supp. 2d at 111.

Even with these guideposts, claims for solatium, unlike those for lost wages, are difficult to quantify, and not readily susceptible to "models and variables." *Id.* (citations omitted). Accordingly, courts are often guided by remedial approaches and formulas applied in similar cases, and in cases where solatium damages are sought, most courts employ the damages model articulated in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006) ("*Heiser I*"). In that case, the Honorable Royce C. Lamberth developed a standardized approach for evaluating IIED claims for solatium damages, after surveying past awards to family members of victims of terrorism. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d at 403. Pursuant to the *Heiser* damages model, "[s]pouses typically receive greater damages awards than parents, who, in turn, typically receive greater awards than siblings." *Heiser I*, 466 F. Supp. 2d at 269. The damages framework set out in *Heiser I* anticipated awards between $8 million and $12 million for pain and suffering resulting from the death of a spouse, $5 million for parents of deceased victims, and $2.5 million for siblings. *Id.*

The *Heiser* "damages model" was explained succinctly in *Braun v. Islamic Republic of Iran,* as follows:

> In determining the appropriate amount to compensate for victims' family members' emotional distress, "the Court may look to prior decisions awarding damages . . . for

solatium." *Acosta*, 574 F. Supp. 2d at 29. Solatium damages, by their nature, are "unquantifiable," *Moradi*, 77 F. Supp. 3d at 72, and therefore, this Court has developed a commonly accepted standardized framework, known as the *Heiser* damages framework, for solatium damages. *Estate of Heiser*, 466 F. Supp. 2d at 269; *see Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror (citing *Valore*, 700 F. Supp. 2d at 85)). As a baseline, the framework awards "approximately $5 million to a parent whose child was killed" in a terrorist attack. *Estate of Heiser*, 466 F. Supp. 2d at 269.

*Braun*, 228 F. Supp. 3d at 85.

The numbers set forth under the *Heiser I* damages framework are "not set in stone." *Murphy*, 740 F. Supp. 2d at 79, as "strict application of precedent could lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 57 (D.D.C. 2009) (quotation omitted). Courts have discretion to deviate from the *Heiser* framework and may enhance the award depending on factors such as an especially close relationship between the plaintiff and the decedent, the circumstances surrounding the terrorist attack which made it particularly agonizing, and medical proof of a claimant's severe pain, grief or suffering. *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26-27 (D.D.C. 2011). Downward departures may be justified where the evidence suggests an attenuated relationship between the victim and his family members. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010); *see Relvas v. Islamic Republic of Iran*, Case No. 1:14-cv-01752, 2018 Westlaw 1092445 *5 (D.D.C. Feb. 28, 2018) (adjusting the damages for one plaintiff downward based on "the paucity of evidence describing the relationship between the [claimant and decedent]"); *see also Roth v Islamic Republic of Iran*, 78 F. Supp. 3d at 406 (denying an award of solatium damages "where no evidence [was] offered to show injury that an award of solatium damages might compensate.") While "many FSIA decisions issued by the District Court follow *Heiser's* solatium damages model," the District Court "[is] not required to follow *Heiser* for the

simple reason that *Heiser* is not controlling precedent." *Fraenkel*, 893 F. 3d at 361*; see Labow v.*

*U.S. Dep't. of Justice*, 831 F.3d 523, 532 (D.C. Cir. 2016) (noting that district court opinions do

not establish binding precedent on other courts).

This Court has spent a considerable amount of time examining the nature of the relationship

between Yonadav Hirshfeld and his parents and 12 siblings, including:

- The way Yonadav's parents reacted to the news of the incident at the Mercaz Harav
  Yeshiva and how they had to wait for hours before they were informed of Yonadav's
  death (E. Hirshfeld Tr. 16-18, Z. Hirshfeld Tr. 42-43);

- The circumstances surrounding Zemach's identification of Yonadav's body (Z.
  Hirshfeld Tr. 44);

- The support Yonadav's parents sought through participation in a survivors' support
  group for a period of two years (E. Hirshfeld Tr. 21-23);

- The annual memorial services held for Yonadav, which involve participation by his parents and siblings (E. Hirshfeld Tr. 23, 26-27, 30, 33, Haya Depo. 14);

- Some of the special bonds between Yonadav and his siblings such as how he and his two brothers shared a room (S. Hirshfeld Tr. 54, 57-58), shared activities (David Depo. 14-15, Nehemiya Depo. 14), studied together (Yedidya Depo. 10-11, Hana Decl. Paragraph 4), and worked together (Hana Decl. ¶ 4, S. Hirshfeld Tr. 58);

- The physical and emotional effects of Yonadav's death on his siblings (Zimrat Depo. 16, E. Hirshfeld Tr. 30, 32, David Depo. 12, Amiel Decl. ¶¶ 4-5, S. Hirshfeld Tr. 54, 57-58);

- The help sought by Yonadav's siblings to cope with his death (Nehemiya Depo. 16-17, David Depo. 13-14;

- The ways in which Yonadav is missed and remembered at family events and celebrations (Haya Depo. 13-14, Yedidya Depo. 14-15, Hana Decl. ¶ 10, David Depo. 16, Nehemiya Depo. 16);

- The difficulty some of the siblings have in discussing Yonadav (Yedidya Depo. 14-15, Nehemiya Depo. 17-18);

- The other ways in which Yonadav is remembered, including Aviya naming her son for him (Aviya Decl. Paragraph 10) and Haya's husband establishing a non-profit religious organization in honor of Yonadav (Haya Depo. 17).

The Court concludes that Elisheva's Hirshfeld's statements that Yonadav "loved everybody" and "loved to play with [his siblings], he loved to talk to them, he loved to have fun" and "everybody [in the family] felt close" aptly describe Yonadav and his large and loving family.

Accordingly, this Court sees no reason to deviate from the guidance set forth in the *Heiser* case and shall award Elisheva and Zemach Hirshfeld $5,000,000.00 each in solatium damages, and each of Yonadav's 12 siblings shall be awarded $2,500,000.00 in solatium damages.

### D. Punitive Damages

Under the FSIA, a state sponsor of terrorism may be held liable for punitive damages. 28 U.S.C. Section 1605A(c). Punitive damages are designed to "punish [the defendant] for [its] outrageous conduct and to deter [it] and others like [it] from [engaging in] similar conduct in the future." Restatement (Second) of Torts § 908(1); *see Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 105 (D.D.C. 2012); *accord Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 55-56 (D.D.C. 2012). "Punitive damages are warranted where 'defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization and murder of American citizens and others.'" *Braun*, 228 F. Supp. 3d at 86 (citing *Baker*, 775 F. Supp. 2d at 85). In the instant case, punitive damages are warranted to punish Iran for its material support of Hamas, a terrorist group.

To calculate punitive damages, courts in similar cases have considered "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Wulta v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 41 (D.D.C. 2012) (quoting *Acosta*, 574 F. Supp. 2d at 30). Regarding the first factor, as previously detailed by this Court, Defendant Iran provided financial and material support for Hamas, with the end goal of Hamas carrying out terrorist attacks in Israel. Defendant's callous actions of providing material support for Hamas' terrorist activities deserve condemnation. The second factor points further to punitive damages

insofar as Yonadav Hirshfeld, an 18-year old student, was suddenly and unexpectedly shot and killed by a Hamas shooter targeting Jewish unarmed students at their school, which left Yonadav's parents and siblings emotionally distraught. The third factor — the need for deterrence — is bolstered by the expert testimony in this case which indicated that Iran's support of Hamas is ongoing. This deterrence factor is affected by the existence of prior awards of punitive damages for the same incident. Upon a search of FSIA cases, it does not appear that there are any prior punitive damage awards arising from this specific incident, and thus, the punitive damages awarded in this case need not be adjusted downward for that reason. While there is "[n]o principle" prohibiting a plaintiff from recovering punitive damages "simply because punitive damages have previously been awarded against the same defendant . . . for the same conduct," courts do consider the effects of cumulative punitive awards. *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d at 25-26 (internal citations omitted). Regarding the wealth of Defendant Iran, which is the fourth factor to be considered, the expert testimony in this case affirms that Iran was willing and able to commit to spending hundreds of millions of dollars in support of Hamas. Levitt Tr. 110-111.

Courts have used several different approaches to the calculation of punitive damages against foreign sovereign defendants who support terrorism. *See Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 105 (D.D.C. 2017) (Punitive damages may be calculated by generating a multiplicand and multiplier, with the multiplicand being either the defendant's annual expenditures on terrorist activities — used for exceptionally deadly attacks — or the amount of compensatory damages already awarded, which is used in cases without exceptional circumstances. The multiplier used by judges in this Court ranges from three to five).

One approach is to multiply the foreign state's "annual expenditures on terrorism" by a factor between three and five. This approach, which may result in awards in the billions of

dollars, has been used in the case of exceptionally deadly attacks, such as the 1983 bombing of the Marine barracks in Beirut, which killed 241 American military servicemen. Another approach awards a fixed amount of $150,000,000 per affected family.

*Braun v. Islamic Republic of Iran*, 228 F. Supp. 64, 87 (2017) (internal citations omitted) (using the $150 million approach to punitive damages); *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 233 (D.D.C. 2012) (awarding $300 million in punitive damages to two victims and their families); *Baker*, 775 F. Supp. 2d at 86 (awarding $150 million each to families of three victims); *Gates*, 580 F. Supp. 2d at 75 (awarding $150 million each to the estates of two victims).

Defendant Iran's conduct in providing material support to the terrorist group Hamas that perpetrated the attack at the Mercaz Harav Yeshiva, whereby young students at a Jewish religious educational institution were targeted and eight of them were killed, is outrageous. The conduct is however more similar to conduct in cases involving awards of $150 million in punitive damages than in cases where a multiplier of [Iran's] expenditures on terrorism is used, and accordingly, this Court will award $150,000,000.00 in punitive damages to the family of Yonadav Hirshfeld against Defendant Iran.

## VI. CONCLUSION

For the foregoing reasons, the Court GRANTS default judgment against Defendant the Islamic Republic of Iran ("Iran") and awards damages totaling $191,950,000.00 to the Plaintiffs herein. More specifically, the Estate of Yonadav Hirshfeld shall be awarded $1,000,000.00 in damages for Yonadav Hirshfeld's pain and suffering. Yonadav Hirshfeld's parents, Elisheva and Zemach Hirshfeld, shall be awarded $5,000,000.00 each in solatium damages and $950,000.00 jointly in economic damages. Yonadav's twelve siblings — Shalom Hirshfeld, Zimrat Bracha Zuckerman, Haya Hamital Novik, Yedidya Hirshfeld, Hana Shandorfy, David Yinon Hirshfeld, Aviya Freedman, Nehemiya Hirshfeld, Amiel Hirshfeld, Elyashiv Schmuel Hirshfeld, and minors

EH and SH (through their mother) — shall each be awarded $2,500,000.00 in solatium damages.

Punitive damages against Iran are awarded in the amount of $150,000,000.00 to the family of

Yonadav Hirshfeld. An appropriate Order accompanies this Memorandum Opinion.


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge